```
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
UNITED STATES,

                                    Plaintiff,


-v-                                 5:21-CR-124


BETHANN WALLACE,

                                    Defendant.
-----------------------------------------------------x
```

**VIDEO COMPETENCY HEARING TRANSCRIPT**
**BEFORE THE HONORABLE THÉRÈSE WILEY DANCKS**
April 6, 2022
100 South Clinton Street, Syracuse, New York


For the Plaintiff:
(Appearance by video)

    UNITED STATES ATTORNEY'S OFFICE
    100 State Street
    Rochester, New York 14614
    BY:  **SEAN C. ELDRIDGE, ESQ.**

For the Defendant:
(Appearance by video)

    LAW OFFICE OF STUART J. LAROSE
    247 West Fayette Street
    Suite 315
    Syracuse, New York 13202
    BY:  **STUART J. LAROSE, ESQ.**


*Hannah F. Cavanaugh, RPR, CRR, CSR, NYACR, NYRCR*
*Official United States Court Reporter*
*100 South Clinton Street*
*Syracuse, New York 13261-7367*
*(315) 234-8545*

```
 1

 2

 3                    I N D E X   O F   T E S T I M O N Y

 4

 5

 6    Witnesses                 Direct    Cross   Redirect    Recross

 7    Dr. Amor Correa              9        43       --          --

 8    Dr. Jose Silvas             49        80       --          --

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            (The Court and all parties present by video.  Time

2    noted:  11:14 a.m.)

3            THE COURTROOM DEPUTY:  United States of America

4    versus Bethann Wallace, case 21-CR-124.

5            Counsel, state your appearances.

6            MR. ELDRIDGE:  Good morning, your Honor.  Sean

7    Eldridge for the United States.

8            THE COURT:  Good morning, Mr. Eldridge.

9            MR. LAROSE:  And good morning, Stuart LaRose

10   appearing for the defendant, Bethann Wallace.

11           THE COURT:  All right.  Good afternoon, Mr. LaRose.

12           And we've got Ms. Wallace on the video, too.  Good

13   morning, Ms. Wallace.

14           THE DEFENDANT:  Good morning.

15           THE COURT:  All right.  So we are here because I have

16   the government's motion to have a hearing under *Sell v. United*

17   *States,* that's 539 U.S. 166, it's a 2003 case, for the purpose

18   of determining whether or not you should the medicated, Ms.

19   Wallace, for the purpose of restoring your mental competency to

20   assist in defending yourself with regard to the charges here and

21   to stand trial in this action.

22           And we're doing it by video because everybody is in

23   lots of different places.  You're in Texas, Mr. Eldridge is in

24   Rochester, we're in Syracuse, and other folks are -- the

25   witnesses, I think, are down in Texas, too.

PROCEEDINGS                                           4

1           All right.  So do you understand what the hearing is

2    about, Ms. Wallace?

3           THE DEFENDANT:  I understand, Judge Dancks.  And if I

4    could take a minute, please.  I'm refusing because there's no

5    actual charges and you know it and I know it, and I don't

6    appreciate psychiatry and psychology trying to tell me that I'm

7    delusional because there's no actual charges because he's not a

8    congressman, so it doesn't matter if I called his phone.  And

9    that's really all I have to say to you.  I probably should've

10   told you that in Syracuse but I didn't.

11          THE COURT:  Okay.  Well, we're here, you know, and

12   you've been given notice of the hearing and you're entitled to

13   be here, you know, for this hearing, you know, because -- and

14   you're represented by counsel at this hearing and you have the

15   right to testify on those issues if you wish to, you know, and

16   confront the witnesses that the government is going to put on,

17   too.  And you're --

18          THE DEFENDANT:  So I --

19          THE COURT:  Hold on, hold on, hold on.  I just

20   want -- your counsel can present evidence on your behalf and

21   cross examine the witnesses.  So we're ready to go forward on

22   that.  And I understand your position that you don't think the

23   charges -- there are any charges against you, but in fact there

24   are.  I understand your position in that regard, but -- so we're

25   ready to go forward with this hearing now and you should stay

1   here and attend this hearing, do you understand?

2           THE DEFENDANT:  So what happens if I don't?  I'm not

3   staying -- attending a hearing that I think is bogus, so I'm not

4   staying.

5           THE COURT:  The hearing will go forward.  You have a

6   right to be here and if you leave, then you're waiving your

7   right to be here, do you understand?

8           THE DEFENDANT:  Well, I'm waiving my right to be

9   here.  I just explained to you how I feel and I'm being very

10  polite.

11          THE COURT:  And I understand how you feel, but you do

12  have a right to be here and I think you should stay here.

13          THE DEFENDANT:  I don't want to listen to their crap.

14          THE COURT:  Okay.  Well, we're going to go forward

15  with the hearing, so --

16          THE DEFENDANT:  All right.

17          THE COURT:  -- if you leave, you are waiving your

18  right to be here, do you understand that?

19          THE DEFENDANT:  Yes, I do.  I just told you that I

20  understood that.

21          THE COURT:  Okay.  All right.  We're going to go

22  forward without you then.

23          (Whereupon, the defendant disconnected from the

24  proceeding.)

25          THE COURT:  Mr. Eldridge, would you like to make an

1    opening statement?

2            MR. ELDRIDGE:  Thank you, Judge.  Very, very briefly.

3    OPENING STATEMENT BY MR. ELDRIDGE:

4            MR. ELDRIDGE:  As the Court already recited, we're

5    here pursuant to the government's motion under *Sell*.  Today the

6    government is going to present two witnesses, both who are

7    employed by the Bureau of Prisons at FMC Carswell, that's Dr.

8    Correa and Dr. Silvas.  And just to outline this very briefly,

9    Dr. Correa is an individual who previously submitted a report to

10   the Court recommending that the Court find Ms. Wallace not

11   competent to proceed and she's going to testify primarily about

12   her evaluation of the defendant and her interactions with her.

13           After the Court determined she was incompetent and we

14   entered what I'll call the 120-day restoration period, Dr.

15   Correa continued to work with Ms. Wallace and also Dr. Silvas

16   from Carswell got involved at that point, too.  For kind of

17   layman's terms, Dr. Correa basically has, and as the testimony

18   is going to show, the primary responsibility or burden of

19   diagnosing the defendant in the first place, and then once a

20   determination is made that she can't be restored to competency

21   through what I'll call traditional means, things like talk

22   therapy that Court is going to hear about, it essentially then

23   becomes Dr. Silvas's responsibility to determine whether or not

24   there are medications that could be used and that would be

25   appropriate, that would be safe, and that would meet the other

1    standards under *Sell*, the second, the third, and the fourth

2    prongs.  That is, whether or not the treatment will

3    significantly further the interests, whether the treatment is

4    necessary to further them considering less intrusive

5    alternatives, and whether or not the treatment is medically

6    appropriate.

7            The first *Sell* factor, the important governmental

8    interests in trying the individual, is a legal determination for

9    the Court to make, which I assume we'll brief after the hearing

10   and not really the subject of today's proceeding.  We're focused

11   on the second, the third, and the fourth prongs of *Sell*.

12           There's six exhibits the government's going to offer.

13   We've provided those to everyone in advance since we're

14   proceeding in this remote fashion.

15           And, Judge, that's a brief summary of what I

16   anticipate presenting this morning.  Thanks very much.

17           THE COURT:  All right.  And those exhibits are Docket

18   No. -- well, the exhibit and witness lists are Docket No. 40,

19   but, Mr. LaRose, you got copies of the exhibits, 1 through 6?

20           MR. LAROSE:  Yes, Judge, I have them all.

21           THE COURT:  Okay.  All right.  And just before I hear

22   from you on a brief opening statement, Mr. LaRose, I just want

23   to confirm with you, Mr. Eldridge, the maximum penalties in this

24   case.

25           On Count #1, I have ten years with a $250,000 fine

1   and then -- these are the maximum penalties for Count #1, which

2   is threatening a United States official, ten years maximum

3   imprisonment, $250,000 fine, three years of supervised release,

4   and a $100 special assessment.  And then Count #2, which is

5   threats by interstate communications, the maximum imprisonment

6   is five years, $250,000 fine, three years of supervised release,

7   and a $100 special assessment.  Is that correct?

8           MR. ELDRIDGE:  Yes, your Honor.

9           THE COURT:  Okay.  I just want to make sure I didn't

10  miss anything there in terms of the maximum penalties.

11          All right.  Then, Mr. LaRose, would you -- do you

12  wish to make a brief opening statement?

13  OPENING STATEMENT BY MR. LAROSE:

14          MR. LAROSE:  Just briefly, your Honor.  And that is

15  that, obviously, this is a complicated and default situation.

16  With regards to, you know, what determination the Court should

17  make, I think is largely going to be based on testimony of the

18  witnesses today and whether or not there are alternative means

19  that could assist Ms. Wallace rather than medicating her as she

20  has objected to and continues to object to.

21          THE COURT:  All right.  Anything else, Mr. LaRose?

22          MR. LAROSE:  Nothing further at this time.

23          THE COURT:  Okay.  All right.  Mr. Eldridge, then,

24  why don't you call your first witness and we'll get the witness

25  sworn in.

1              MR. ELDRIDGE:  Thank you, Judge.

2              I think if I could -- before -- just briefly, I think

3    it's obvious to all of us since we were sitting here, but for

4    purposes of the record, after the Court had colloquy-ed Ms.

5    Wallace about whether she wanted to stay or not, after her last

6    statement, I think she said something to the effect of, "I don't

7    want to listen to this crap," and she stood up and she walked to

8    the back door with one of the guards and they left the room and

9    then that camera signed off from FMC Carswell.

10             THE COURT:  Okay.  Yep, you're correct there, and I

11   appreciate it.  And I had advised her that if she didn't stay,

12   then she was waiving her right to be here and she understood

13   that.

14             MR. ELDRIDGE:  Thank you, your Honor.

15             The government's first witness who I call is Dr. Amor

16   Correa.

17             THE COURTROOM DEPUTY:  Dr. Correa, please raise your

18   right hand.

19             (Witness sworn.)

20             THE COURTROOM DEPUTY:  Thank you.

21             MR. ELDRIDGE:  Judge, may I inquire?

22             THE COURT:  Yes.

23             MR. ELDRIDGE:  Thank you.

24   DIRECT EXAMINATION BY MR. ELDRIDGE:

25   Q.  Dr. Correa, could you tell the Court where you're employed,

1   please?

2   A.   Yes, I am a forensic psychologist at the Federal Medical

3   Center at Carswell, Texas.

4   Q.   And how long have you worked at FMC Carswell?

5   A.   Since May of 2016.

6   Q.   Okay.  Before you started working at FMC Carswell, did you

7   work somewhere else in the Bureau of Prisons?

8   A.   Yes, I worked for a few years at the federal detention

9   center at Brooklyn and I was also a predoctoral intern at the

10   Federal Medical Center in Butner, North Carolina.

11   Q.   Okay.  And I think you said that you're currently a

12   forensic psychologist.  What was your job title when you worked

13   at MDC Brooklyn?

14   A.   Clinical psychologist.

15   Q.   All right.  Can you briefly tell the Court, what's the

16   difference between a clinical psychologist and a forensic

17   psychologist?

18   A.   A clinical psychologist -- my degree is in clinical

19   psychology and a clinical psychologist does testing and

20   diagnosis, different types of evaluations, and also therapy

21   treatment, individual therapy, group therapy, things like that.

22        And a forensic psychologist -- forensic psychology means

23   any intersection between psychology and the law.  And so

24   basically a forensic evaluation is a clinical evaluation geared

25   towards answering some sort of legal question.

1   Q.   All right.  You mentioned a little bit about schooling.  Do

2   you have before you Government's Exhibit 1?

3   A.   Yes.

4   Q.   All right.  Is Government's Exhibit 1 a true and accurate

5   copy of your curriculum vitae, which I'll call a CV?

6   A.   Yes.

7   Q.   And did you prepare this document and then provide it to me

8   before our proceedings here today?

9   A.   I did.

10            MR. ELDRIDGE:  Judge, just for purposes of the

11   hearing, I'll offer Exhibit 1.

12            THE COURT:  All right.  Mr. LaRose, any objection?

13            MR. LAROSE:  No, objection.

14            THE COURT:  All right.  Exhibit 1 is admitted.

15   Q.   Dr. Correa, I'm not going to go through all of your CV, but

16   just briefly, can you tell the Court the highest degree that you

17   received and when you received that?

18   A.   I have a Ph.D. in clinical psychology, received in August

19   of 2013.

20   Q.   Okay.  And am I correct that that is shortly before you

21   started working as a clinical psychologist at MDC Brooklyn?

22   A.   Yes.

23   Q.   Okay.  Dr. Correa, how is a psychologist different than a

24   psychiatrist?

25   A.   Psychology, we do psychological testing for the purposes of

1   coming up with a diagnosis.  We also do mental health therapy,

2   which is what you referred to as talk therapy.  It's also called

3   psychotherapy.  It's basically one-on-one or group interventions

4   that don't require medication.

5        A psychiatrist has gone to medical school and so they're

6   trained in the biological aspects of mental health and they're

7   the ones that are trained and have the background for

8   prescribing medications and knowing which combinations might

9   work for the person, and that's not my role as a psychologist.

10  Q.   All right.  So as a psychologist you have a Ph.D., but not

11  an M.D., fair statement?

12  A.   Yes.

13  Q.   Okay.  Do -- do you work with psychiatrists at FMC

14  Carswell?

15  A.   Yes.

16  Q.   How do the psychologists and psychiatrists generally work

17  together at FMC Carswell?

18  A.   We have a mental health treatment team that oversees all of

19  our patients on the various mental health units that we have

20  here at Carswell.  And the treatment team involves

21  psychologists, social workers, and various other disciplines,

22  including psychology.  And so we'll meet regularly to talk about

23  the patients and any needs that they might have.  And so it's a

24  collaborative effort with all those disciplines.

25  Q.   When an individual first comes into the mental health unit

1   at FMC Carswell, do they immediately meet with a psychiatrist or

2   a psychologist?  How does that kind of intake process generally

3   work?

4   A.   They always are met -- the first moment they arrive,

5   they're screened by psychology.  And if they're here for a

6   forensic evaluation, they will meet either that week or the next

7   week by -- they'll meet with their entire treatment team.  And

8   the psychiatrist is typically present at that treatment team

9   meeting and that's their -- usually their first interaction with

10  psychiatry and the -- all of the psychologists that work on that

11  unit.

12  Q.   Okay.  In your time as a psychologist, can you estimate how

13  many people you have evaluated for mental health conditions?

14  A.   Specifically for forensic evaluations, more than 200.  But

15  general clinical, I mean, I've been doing general clinical

16  evaluations since 2006.

17  Q.   So I take it that number would be even greater than the

18  over 200 forensic evaluations you've done?

19  A.   Yes.

20  Q.   Is it fair to say that the -- a forensic evaluation is what

21  you conducted with Ms. Wallace in this case and that we're going

22  to be talking about this morning?

23  A.   Yes.

24  Q.   Okay.  Dr. Correa, have you testified before in federal

25  courts as an expert in psychology?

1    A.   Yes.

2    Q.   Can you estimate how many times -- let me ask you this

3    first, pardon me:  Have you testified before as an expert in

4    psychology at federal court competency hearings before?

5    A.   Yes.

6    Q.   Can you estimate how many times you've done that?

7    A.   For competency specifically, let's say I've testified as an

8    expert about 30 times.  I would say that 20 of those, at least,

9    were competency hearings.

10   Q.   Okay.  And what about the same question regarding *Sell*

11   hearings, have you testified before as an expert in *Sell*

12   hearings in Federal Court?

13   A.   Yes.

14   Q.   Can you estimate how many times you've done that?

15   A.   About four times.

16   Q.   Okay.  I want to shift gears and talk specifically now

17   about your interactions here.

18        Are you familiar with Bethann Marie Wallace?

19   A.   Yes.

20   Q.   All right.  And when I refer to Ms. Wallace, are we talking

21   about the individual who was on the screen at the beginning of

22   these proceedings and told the judge that she didn't want to

23   participate in these hearings today?  Is that the person that

24   we're talking about?

25   A.   Yes, that's her.

1   Q.   Okay.  How did you come to be involved or in contact with

2   Ms. Wallace at FMC Carswell?

3   A.   She was assigned on my caseload as a person that I was

4   going to do a forensic evaluation for and I met her as soon as

5   she arrived at our receiving and discharge department here at

6   Carswell.

7   Q.   Okay.  And did you ultimately conduct a court ordered

8   evaluation of Ms. Wallace to determine if she was competent to

9   proceed in these federal court proceedings and to assist in her

10  defense?

11  A.   Yes.

12  Q.   Did that take place at FMC Carswell?

13  A.   Yes.

14  Q.   Have you had any contact with Ms. Wallace outside of FMC

15  Carswell?

16  A.   No.

17  Q.   In connection with that court ordered evaluation that you

18  conducted, did you prepare a report that details your findings

19  and the work that you did to determine Ms. Wallace's competency?

20  A.   Yes.

21  Q.   All right.  If you could take a look at Government's

22  Exhibit 2, do you recognize what Government's Exhibit 2 is?

23  A.   I do.

24  Q.   What is Government's Exhibit 2?

25  A.   It is the first report that I wrote regarding Ms. Wallace's

1    competency.

2    Q.   Okay.  And is your report itself dated July 16th with a

3    cover transmittal letter from the warden dated July 22nd of

4    2021?

5    A.   Yes.

6    Q.   All right.  Your report dated July 16th, does that consist

7    of eight pages?

8    A.   Let me verify.  Yes, it does.

9    Q.   All right.  Did you write this report?

10   A.   I did.

11   Q.   Is that your signature that we see on page eight of the

12   report?

13   A.   Yes.

14   Q.   And is this a true and accurate copy of your competency

15   evaluation report that you completed and transmitted to the

16   Court in these proceedings?

17   A.   Yes.

18          MR. ELDRIDGE:  Judge, I'd offer Government's

19   Exhibit 2 for purposes of this hearing.

20          THE COURT:  Mr. LaRose, any objection?

21          MR. LAROSE:  No objection, your Honor.

22          THE COURT:  All right.  Exhibit 2 is admitted then.

23   Q.   Dr. Correa, before you generated your July 16, 2021,

24   report, can you estimate how many times you interacted with Ms.

25   Wallace?

1  A.   For formal interviews and testing, two or three times.  And

2  I saw her in her initial arrival at the R&D department.  I saw

3  her at her treatment teams meetings which happened every

4  30 days.  So maybe once or twice during treatment meetings

5  during the initial evaluation and also informally I would see

6  her in the hallway whenever I was on the housing unit for those

7  daily meetings.

8  Q.   Okay.  Fair to say you've had a significant amount of

9  contact with Ms. Wallace before you completed your July 16,

10 2021, evaluation and report?

11 A.   Yes.

12 Q.   Did you review any documents or reports before you

13 generated your July 16, 2021, report?

14 A.   I did.

15 Q.   All right.  And I don't want to go through them all, but

16 are those summarized at the bottom of page one of your report

17 under the section Review of Records?

18 A.   Yes, they are.

19 Q.   And just briefly, why do you review records before you meet

20 with Ms. Wallace to start your evaluation?

21 A.   It's important for me to know a defendant's history so that

22 I'd know what diagnostic questions to ask, if there are any

23 pre-existing mental health conditions, if there's anything

24 mental health-related that they might have said in those

25 records.  So, for example, Ms. Wallace wrote several letters, is

1   there anything mental health-related contained in those letters.

2   That's the reason that I want to have that background before I

3   start meeting with the person.

4   Q.   Okay.  You mentioned tests.  Did you conduct any

5   psychological tests with Ms. Wallace as part of your evaluation?

6   A.   I did.

7   Q.   What was the first test that you conducted with her?  What

8   is that test called?

9   A.   The personality assessment inventory, the PAI.

10  Q.   All right.  And what is that test and what is its purpose?

11  A.   It's a general test of mental health symptoms and

12  personality traits.  It also has validity scales which indicate

13  whether or not a person is basically being honest or paying

14  attention and taking the test seriously so you can sort of gauge

15  if a person is overplaying their symptoms or minimizing their

16  symptoms or just flat out not really paying attention to the

17  test.  And so it's a good way to check the validity of the

18  person's self-report of their symptoms in situations.

19  Q.   And is the PAI test a test that is generally used and

20  relied upon by psychologists?

21  A.   Yes.

22  Q.   And specifically, is it a report -- excuse me, a test that

23  you used and relied upon as part of your competency evaluation

24  of Ms. Wallace?

25  A.   Yes.

1    Q.   Let's talk about the next test you conducted.  What is that

2    test and briefly how does it work and what is it geared to help

3    you learn?

4    A.   So the Evaluation of Competency to Stand Trial-Revised, or

5    the ECST-R, is a specific competency test and it's geared

6    towards identifying the three prongs of the *Dusky* standard, so a

7    person's ability to consult with counsel, their rational and

8    factual understanding of the proceedings, and it also has

9    validity scales, which would indicate if the person is

10   overplaying their deficits or underplaying, answering in a way

11   that's defensive or evasive.

12   Q.   You said understanding of the courtroom proceedings.  Is

13   that --

14   A.   Mm-hmm.

15   Q.   -- a conclusion you reached that is summarized starting on

16   the bottom of page four of your report, Government Exhibit 2?

17   A.   Yes.

18   Q.   And is it fair to summarize some of the questions that you

19   would be discussing with Ms. Wallace under this test as things

20   like what is the judge's role in the proceeding or what does a

21   prosecutor do or what does a defense lawyer do or what does the

22   jury do?  Is it those kind of general questions about the legal

23   system that you're asking as part of the ECST-R?

24   A.   That's part of one of the three prongs that the ECST-R does

25   address.

1   Q.   And did you in fact ask those types of questions to Ms.

2   Wallace?

3   A.   Yes.

4   Q.   How were her responses to those questions?  How would you

5   characterize them?

6   A.   So factually, when she was not talking about her specific

7   case, she had a very good understanding of general courtroom

8   procedures.

9   Q.   Okay.  So, for example, she understood what the roles of

10  the judge, the jury, the prosecutor, and her defense lawyer were

11  as a general matter, is that a fair statement?

12  A.   Yes.

13  Q.   All right.  You started to say except for when she talked

14  about her case.  Let's talk about that.

15       When you talked to Ms. Wallace specifically about this

16  criminal prosecution against her, did anything change?

17  A.   Yes, that's where her responses --

18  Q.   How so?

19  A.   That's where her responses to the questions stopped being

20  accurate and reality-based.  She exhibited several delusional

21  thoughts when she was talking about her specific court situation

22  and all of the people involved in her legal case.

23  Q.   All right.  And are those laid out in pages five and six of

24  your report?

25  A.   Yes.

1   Q.   All right.  I'm not going to go through all of them, but

2   could you give the Court an example or two of what you mean when

3   you say she exhibited delusional statements or thoughts with

4   regard to her particular case?

5   A.   Yes.  So first of all, a delusional thought is something

6   that is fixed and not based in reality and also resistant to any

7   kind of evidence to the contrary.  So the person rigidly

8   believes those things to be true when they're not.  And so one

9   of the most concerning things for Ms. Wallace's competency is

10  that she thinks her -- for example, she thinks her defense

11  attorney is biased against her because she was present when this

12  attorney supposedly was arrested for a drug deal and has a

13  vendetta against Ms. Wallace for being involved in his

14  indictment.  She also has delusional thoughts about her judge,

15  believing that her judge has been against her since she was a

16  child because of some argument that the judge had with her

17  father.

18  Q.   Did she also exhibit similar delusional statements and

19  beliefs with regard to both myself, the prosecutor in this case,

20  as well as to Congressman John Katko, the victim of the threat

21  in this case?

22  A.   Yes.

23  Q.   Okay.  And I'm not going to go through those, but those are

24  detailed, I think, on page five of your report, is that correct?

25  A.   Yes.

1   Q.   Is the ECST-R a test that is generally relied upon by

2   psychologists to aide in determining the competency of an

3   individual?

4   A.   Yes.

5   Q.   And is it a test that you relied on specifically to

6   determine whether or not Ms. Wallace is competent in this

7   proceeding?

8   A.   Yes.

9   Q.   Dr. Correa, let me ask you this:  Based on the PAI and the

10  ECST-R themselves, could you generally diagnose someone just by

11  giving them those two tests?

12  A.   Not by testing alone.  I also rely on --

13  Q.   Yeah, why -- yeah, why is that?  If you could explain that,

14  please.

15  A.   You need a fuller picture than what just a couple of tests

16  can give you.

17  Q.   And is that why, as you, I think, described to the Court

18  previously, you spend time with her in different settings, in

19  group settings, talking to her in the hallways that you

20  testified about before?  Are those important factors to you in

21  ultimately making your determination?

22  A.   Yes, those behavioral observations in a variety of

23  different types of contexts.  And, also, it's important to know

24  the records that have been provided and also consult with other

25  mental health professionals that have different types of

1  interactions with Ms. Wallace than I might have.  And so all of

2  those combined result in the final diagnosis and issues related

3  to the determination of competency.

4  Q.   You said something about observations you made of Ms.

5  Wallace.  I want to talk about that for a minute.

6  A.   Mm-hmm.

7  Q.   When you interacted with her, was her demeanor generally

8  appropriate?

9  A.   Yes.

10  Q.   Was she generally easy to talk to?

11  A.   Yes.

12  Q.   How would you characterize your interactions with her aside

13  from when you were talking about the specific facts of this

14  prosecution?

15  A.   Outside of talking about things related to her case, Ms.

16  Wallace was pleasant, she was active, she had a lot of hobbies

17  on the unit, she interacted appropriately with all of her peers

18  on the housing unit, she exercised, she was jovial, polite, and

19  really a very well behaved person to have on the housing unit.

20  She created no problems at all, which is in direct contrast to

21  when she starts talking about her case.  She behaved much

22  more -- in a much more curt manner which would be analogous to

23  how she behaved in court today.

24  Q.   I was going to ask you about that.  In terms of how she

25  behaved at the beginning of the court proceeding when we were

1  talking about her specific case, is that similar or different

2  than how she would interact with you when you were talking about

3  the specifics of this court case?

4  A.   So when it came to talking about the specifics of her court

5  case, it doesn't matter if it was me bringing it up to her or

6  somebody else on the housing unit or the treatment team, she

7  would behave the same way.

8  Q.   Okay.  And just -- I want to make sure I understand and

9  that the record is clear, when you discussed with Ms. Wallace

10 general legal matters, what does the Judge do, what does the

11 jury do, how would you characterize those interactions with her?

12 A.   In general, she was not agitated, she was not frustrated,

13 she was not indignant, she gave full answers, and she gave

14 correct answers to all of those -- essentially, you know, test

15 questions gauging her knowledge at a general level.

16 Q.   All right.  And then on the other side of the coin, when

17 you talked to her specifically about the facts of this case or

18 the individuals involved in this case, Congressman Katko, Mr.

19 LaRose, her defense attorney, Judge Dancks, myself, the

20 prosecutor, how would you characterize those interactions?

21 A.   She was very angry, very defensive, and rigidly adhering to

22 her delusional beliefs about all the parties involved.

23 Q.   All right.  You said her delusional beliefs.  At the

24 beginning of the proceeding, did you hear Ms. Wallace make

25 statements to the effect of that there are no actual charges and

1  that Mr. Katko is not an actual congressman?  Did you hear her

2  say those things?

3  A.   Yes.

4  Q.   Would you consider those to be delusional statements?

5  A.   Yes.

6  Q.   Are those consistent with the delusional statements you've

7  been describing before and that are outlined in your report at

8  pages five and six?

9  A.   Yes.

10 Q.   Why are those delusional statements important to you as a

11 treating psychologist?

12 A.   First and foremost, it's important for her diagnosis.  That

13 being said, it's not necessarily -- okay.  I'll backtrack a

14 little bit.

15      It's important for her diagnosis, but it's also important

16 for her competency because these delusions directly relate to

17 her understanding of the court proceedings against her.

18 Q.   In terms of those delusions, would you consider those to be

19 significant or textbook or some other descriptor examples of any

20 particular disease or disorder?

21 A.   I diagnosed Ms. Wallace with delusional disorder.

22 Q.   Okay.  So let's talk about that.  What is delusional

23 disorder?

24 A.   Okay.  So delusional disorder is part of what we call the

25 psychotic disorders.  And so some other disorders that fall into

1   that category are schizophrenia, where a person will have

2   hallucinations and delusions.  But for Ms. Wallace, she was

3   so -- she was not experiencing any hallucinations, she never

4   has, and she also didn't exhibit any of the functional

5   difficulties that people with a more severe diagnosis like

6   schizophrenia do.

7        Like I said, she had a lot of hobbies on the unit, she

8   didn't need assistance with anything, and so unless you were

9   talking to her about her delusions, she seemed like a very

10  perfectly functional person.  And so that level of ability to

11  function day-to-day is what puts her in the delusional disorder

12  category as opposed to something more severe.  So her only

13  predominant symptoms were these delusions.

14  Q.   Is delusional disorder a diagnosis that you have dealt with

15  before in your time as a psychologist?

16  A.   Yes.

17  Q.   Is it a common diagnosis or condition that you've dealt

18  with in your experience as a psychologist?

19  A.   Yes.

20  Q.   Dr. Correa, in your report at the bottom of page six, you

21  reference diagnosing Ms. Wallace with delusional disorder

22  persecutory type.  So I want to talk about that for a minute.

23       First, is that a diagnosis that's recognized in the DSM-5?

24  A.   Yes.

25  Q.   Okay.  What do you mean -- we talked a little bit about

1  delusional disorder.

2      What do you mean when you say persecutory type?

3  A.   That's a classification of the type of delusions that are

4  involved for the person.  And so persecutory type encompasses

5  delusions of being somehow plotted against or persecuted or

6  conspired against.  And so the bulk of Ms. Wallace's delusions

7  are of that nature, people are out to get her.

8  Q.   Okay.  Persecutory delusions, is that something that you

9  regularly deal with in your practice as a psychologist?

10 A.   Yes.

11 Q.   I want to talk to you a minute about -- for a minute about

12 your diagnosis.  So after you diagnosed -- let's stop there.

13 Let me ask you a different question.  I apologize.

14     How did you come to your diagnosis of Ms. Wallace as having

15 delusional disorder persecutory type?

16 A.   After reviewing all of the previous records and all of the

17 test results, also my interactions with her and what she tells

18 me during interviews, checking with the mental health nurses to

19 see her level of functioning.  And so all of that plays in

20 because that's -- the level of functioning piece is pretty

21 crucial to differentiating delusional disorder from some of the

22 other more severe, let's say, psychotic disorders where she's

23 having hallucinations.

24 Q.   Okay.  And in diagnosing this condition, is it fair to say

25 that you have to rely on your training and experience and

1   background to make this diagnosis?  And what I mean by that

2   is -- maybe asked a better way, could you give someone a blood

3   test like you would test for high cholesterol to find out that

4   somebody has delusional disorder?  Is that possible?

5   A.   All right, there's no one test for delusional disorder.

6   Q.   Okay.  So is it, in fact, a combination of all of the

7   things you've been discussing here this morning, the two tests,

8   your observations, and the findings that you've outlined in your

9   report, Government Exhibit 2?

10  A.   Yes.

11  Q.   Are the things that you talked about, Ms. Wallace's correct

12  answers and polite demeanor when talking about the judicial

13  system in general, and then her delusional statements and change

14  of demeanor when talking about this specific case consistent

15  with delusional disorder persecutory type?

16  A.   Yes.

17  Q.   How so?

18  A.   So, for example, because of her delusions, the only two

19  prongs of the *Dusky* standard that are effective for Ms. Wallace

20  are her rational understanding.  So she doesn't have a rational

21  grasp of what's really happening in her legal case.  It's all --

22  her understanding is all based on delusional thoughts.  She has

23  some delusions about her defense attorney and so that impacts

24  her ability to reasonably consult with counsel in her defense.

25       But her factual understanding is not really impacted at all

1  and that's consistent with delusional disorder where she's not

2  being distracted by hallucinations, she's able to stay organized

3  and focused on factual things, and so that's the high level of

4  functioning that I'm talking about when I say that, you know,

5  she's not -- delusional disorder is very much contained to just

6  specific delusions.

7  Q.  All right.  Dr. Correa, I think I neglected to ask you

8  before if -- as part of your evaluation, did you ask Ms. Wallace

9  if she had been treated by a mental health professional before?

10  A.  Yes.

11  Q.  And did you ask her if she had any issues with drug abuse

12  or alcohol abuse in the past?

13  A.  I did.

14  Q.  And why do you ask those questions?

15  A.  Because they could factor into the diagnosis in multiple

16  ways.

17  Q.  And in this case, your evaluation of Ms. Wallace, did

18  those -- the answers to her questions factor into your diagnosis

19  in any way?

20  A.  Yes.

21  Q.  How so?

22  A.  So I ruled out the notion that any of her delusional

23  thinking was related to her historic substance abuse, alcohol

24  specifically.  She continued to exhibit those thoughts and

25  behaviors regardless of whether she was consuming alcohol or

1  not.

2  Q.   Okay.  And other than alcohol, did she discuss any

3  substance abuse problems that she had in the past?

4  A.   No.  And her records from Helio Health also identified

5  alcohol as the main substance of concern for them.

6  Q.   All right.  And you referenced Helio Health.  Other than

7  the Helio Health evaluation, did she describe any other mental

8  health treatment or evaluations that took place?

9  A.   No prior treatment, which is actually not uncommon for

10  people with delusional disorder.

11  Q.   Why is that?

12  A.   Because they're functional -- they're functional outside of

13  discussions related to their delusions.  And additionally, they

14  don't see their thoughts as delusions, so they don't refer

15  themselves for mental health treatment.

16  Q.   You referenced a Helio evaluation.  Is it your

17  understanding that that Helio evaluation took place as part of

18  these proceedings and was ordered by the Court before Ms.

19  Wallace came to FMC Carswell?

20  A.   Yes.

21  Q.   Okay.  Dr. Correa, after you diagnosed Ms. Wallace with

22  delusional disorder persecutory type, do you sit down and tell

23  her, "Ms. Wallace, I've completed my evaluation, I diagnose you

24  with this condition?"

25  A.   Sometimes I do with certain defendants.  For Ms. Wallace,

 1   since I suspected that she would be staying at Carswell for

 2   another 120 days of restoration, I told her that it was likely

 3   that she was going to not be found competent by the judge and

 4   have to stay for the 120 days, but at that point I didn't go

 5   into detail about her diagnosis because I wanted to preserve any

 6   rapport that I had with her instead of being immediately placed

 7   in her bucket of fake government officials.  And so to try to

 8   keep the rhythm going so-to-speak, I didn't go into a full

 9   explanation, but she already suspected that people thought she

10   was delusional.

11   Q.   Okay.  You started to mention what comes next in

12   maintaining a rapport in a 120-day period, so let's talk about

13   that.

14        You find Ms. Wallace not competent, you submit your report

15   to the Court, what is the next thing that happens in the

16   proceedings?  What is this 120-day period and what are you doing

17   during that time?

18   A.   Okay.  So the 120-day period is a restoration to competency

19   period, and so that's where the treatment team especially -- I

20   mean, if someone were -- if Ms. Wallace were receptive to

21   medications as part of her treatment, there's no reason that she

22   couldn't have started them in the 30 days, but she adamantly did

23   not want to have any medication.  And so for the 120 days,

24   that's when the treatment team starts seriously talking about

25   what it would take to restore this person to competency in the

DR. AMOR CORREA - DIRECT EXAMINATION BY MR. ELDRIDGE      32

 1    four months.

 2        And part of that is group therapy, talk therapy, meetings

 3    with her treatment team, and discussions, if the person needs

 4    it, with the psychiatrist.  And Ms. Wallace was referred for

 5    meetings with the psychiatrist.

 6    Q.   All right.  So do I understand correctly that the general

 7    idea of the 120-day period is for the treatment team at FMC

 8    Carswell to try to restore Ms. Wallace to competency for these

 9    proceedings?

10    A.   Yes.

11    Q.   Okay.  Is medication, like, the first thing that the

12    treatment team jumps to?

13    A.   No.  And in fact, most of -- a lot of people don't need

14    medications to be restored.

15    Q.   All right.  You started to mention some items, group

16    therapy and talk therapy.  Before we start talking about those,

17    let's take a look at another thing, Government's Exhibit 3, if

18    you have that in front of you.

19    A.   Yes.

20    Q.   Do you recognize Government's Exhibit 3?

21    A.   I do.

22    Q.   All right.  And what is Government's Exhibit 3?

23    A.   It is the second report I wrote regarding Ms. Wallace's

24    competency, that would be during the 120-day restoration period.

25    Q.   Okay.  Is the report dated January 7, 2021, with a

1   transmittal cover letter dated January 10th of 2022?

2   A.   Yes.

3   Q.   All right.  And, in fact, is -- that date on the top of the

4   report, January 7, 2021, is that just a typo?  That should

5   really be 2022?

6   A.   It should be 2022.

7   Q.   Okay.  I think you said that this report is generated

8   during the 120-day period.

9        Is this report generated during the period or is this at

10  the end of the 120-day period?

11  A.   It's after the end of the 120 days.

12  Q.   Okay.  At the end of the document here, page five of your

13  report, we see a signature at the bottom.  Whose signature is

14  that?

15  A.   That's mine.

16  Q.   All right.  Is Government's Exhibit 3 a true and accurate

17  copy of your January 7, 2022, report?

18  A.   Yes.

19          MR. ELDRIDGE:  Judge, I offer Government's Exhibit 3

20  for purposes of this hearing.

21          THE COURT:  All right.  Any objection, Mr. LaRose?

22          MR. LAROSE:  No objection.

23          THE COURT:  All right.  Exhibit 3 is admitted.

24  Q.   Dr. Correa, in the 120-day period, you started to mention

25  some things that were done to try to restore Ms. Wallace to

1    competency.  Let's talk about those for a minute.

2        What is group therapy or talk therapy?  First, can you tell

3    me generally what they are?

4    A.   Yeah, so talk therapy typically -- and the way that I used

5    it a while ago is referring to one-on-one sessions with a

6    therapist.  And so since she -- Ms. Wallace was sent here for

7    competency restoration, the treatment goal is to restore her to

8    competency, and so any meetings that she would've had one-on-one

9    with a psychologist would be towards the goal of getting her

10   restored to competency through non-medication means.

11   Q.   All right.  You -- you've accurately predicted my next

12   question, which was:  Was any medication used during this

13   120-day period?

14   A.   Oh, no medication.

15   Q.   Okay.  Have you successfully restored people to competency

16   in this 120-day period by using the things you described, group

17   therapy and talk therapy?

18   A.   Yes.

19   Q.   Were you hopeful that during this 120-day period group

20   therapy and talk therapy would be successful with Ms. Wallace to

21   restore her to competency?

22   A.   Well, Ms. Wallace from the very beginning exhibited very,

23   very rigid adherence to her delusional thoughts, and that's not

24   the best indicator of just talk therapy being successful.  That

25   being said, people can certainly have delusions and still be

1   competent.  It matters -- the flexibility of the delusions

2   matters.  So is the person able to have some delusional thoughts

3   but challenge them and maybe consider some more rational

4   reality-based options, are they insightful, do they recognize

5   themselves that they have delusions and accept that.  And so

6   those are good prognosticators for talk therapy maybe being

7   effective enough to restore the person to competency.

8        Also, I mean, if their delusions had nothing to do with

9   their legal case or their understanding of the proceedings, then

10  they can have delusions as long as they can separate that from

11  their case and still be competent.

12  Q.   Okay.  You said something about being insightful and --

13  A.   Mm-hmm.

14  Q.   -- I think you talk about Ms. Wallace's insight and her

15  disease in her report.

16       What do you mean when you say that Ms. Wallace had poor

17  insight into her condition?

18  A.   So poor insight -- insight in general is really the ability

19  to reflect accurately and learn about their symptoms and accept

20  that they're a symptom.  And so if somebody had insight into the

21  fact that they had delusions, then you can work with that in

22  traditional talk therapy and get them to challenge a little bit

23  about the delusions and introduce more reality-based reasoning.

24  And so if somebody has the ability to be introspective that way,

25  they have what we call insight.

1   Q.   Okay.  Did -- was Ms. Wallace insightful at all into her

2   delusional disorder?

3   A.   No, she thinks that everyone who disagrees with her is --

4   they're actually the ones who are delusional, living in fantasy

5   land.

6   Q.   Okay.  And, in fact, in your report, Government's

7   Exhibit 3, do you outline some of those statements from Ms.

8   Wallace, including -- you know, she says, "how would I take a

9   plea bargain when there are no charges," or, "this is kind of

10  ridiculous, don't you think, there's no charges," and referring

11  to people in the system as being fraudulent and expressing her

12  belief that she's going to get released but it's not going to be

13  by your people.  Are those some of the statements you're

14  referring to?

15  A.   Yeah.  I mean, she told me that -- and she told me this

16  about myself, that if I didn't believe her, that it was just

17  proof that I was part of the fake Antifa government instead of

18  the real government.

19  Q.   Why are those statements important to you during this

20  120-day period?

21  A.   It shows her rigidity and her inability to consider

22  alternative beliefs that are non-delusional.

23  Q.   Okay.  During this 120-day period, do you try to convince

24  her to voluntarily take antipsychotic medications?

25  A.   Yes.

1   Q.   Why?

2   A.   If any member of the treatment team, myself included, the

3   psychiatrist included, and any other psychologist or social

4   worker or mental health nurse really feels that it's the only

5   way to get the person restored to competency, then we'll start

6   having those conversations with her.

7   Q.   Is there a set time during the restoration process that you

8   would get a psychologist -- excuse me, a psychiatrist involved

9   in the process?

10  A.   There's not a set time.  It really depends on the person

11  and their specific symptoms.

12  Q.   Okay.  In this case, did you get a psychiatrist involved

13  during the 120-day period as it relates to Ms. Wallace?

14  A.   Pretty early on during the 120 days.  In fact, I told the

15  psychiatrist during the initial 30-day period that, hey, this --

16  Ms. Wallace is not competent, she'll probably be someone who

17  should be on your radar as potentially needing medication

18  because of her rigidity as far as the delusional thoughts.

19  Q.   And who is the psychiatrist that you're referring to here?

20  A.   Dr. Silvas.

21  Q.   Okay.  Is Dr. Silvas also an individual who works at FMC

22  Carswell with you and is part of the Carswell treatment team?

23  A.   Yes.

24  Q.   Okay.  Fair to say that you got Dr. Silvas involved in Ms.

25  Wallace's case maybe earlier than others or earlier than most

1   based on what you had already observed from Ms. Wallace and what

2   you described as her rigidity about her persecutory beliefs?

3   A.   Only involved in the sense that I informed him that Ms.

4   Wallace should be on his radar as somebody that he might be

5   meeting with.  But that being said, I mean, we didn't push Ms.

6   Wallace into taking medication.  And so he wasn't prescribing

7   anything because, I mean, she has the right to refuse.

8   Q.   All right.  So during this 120-day period, is it fair to

9   say that you recommended and offered medications to her, but it

10  was 100 percent voluntary on Ms. Wallace's behalf whether or not

11  she wanted to take them?

12  A.   Right.

13  Q.   Did she in fact take any?

14  A.   No.

15  Q.   What, if anything, did she tell you about the medications

16  that were proposed to her to help with her condition?

17  A.   That she didn't need it, that she didn't have any mental

18  illness, that it was unnecessary.  And usually in those

19  conversations she would devolve into some tangential

20  conversation about the fraudulent charges and the fraudulent

21  judge and all of that.

22  Q.   And are those behaviors that Ms. Wallace is exhibiting and

23  you're describing consistent with your diagnosis of delusional

24  disorder persecutory type?

25  A.   Yes.

1  Q.   Speaking of medication, do you have any role in

2  recommending or deciding what type of medication might be

3  appropriate for one of your patients?

4  A.   I mean, I have a general sense of the medications that are

5  used for certain diagnoses, like, antidepressants are good for

6  depression, antipsychotics are good for psychosis, so in general

7  terms, yes, based on the diagnosis that I find a person has, but

8  in terms of the actual medications given, that's all up to a

9  psychiatrist.

10 Q.   All right.  So not to oversimplify this too much, but is it

11 fair to say that as the psychologist, you're primarily

12 performing the diagnosis of the condition and then the

13 psychiatrist would be the person who could ultimately prescribe

14 medication if necessary?

15 A.   At Carswell, yeah, basically that's how it works.

16 Q.   Okay.  If a person is being treated for a mental disease or

17 illness during this 120-day period and the staff feels that

18 medication might be necessary, is there any type of an

19 administrative hearing that takes place within the Bureau of

20 Prisons?

21 A.   Yes.

22 Q.   And did one of those hearings take place as it relates to

23 Ms. Wallace?

24 A.   Yes.

25 Q.   And, excuse me, I need to grab my other pile of exhibits.

DR. AMOR CORREA - DIRECT EXAMINATION BY MR. ELDRIDGE      40

1      If you could look briefly at Government's Exhibit 6, let me

2  ask you first:  Were you present at such an administrative

3  hearing on November 17, 2021, at Carswell regarding Ms. Wallace?

4  A.   Yes, I was.

5  Q.   What is the purpose of that hearing?

6  A.   The purpose of the hearing -- in general, it's an

7  administrative hearing to see if a person either needs -- meets

8  criteria for involuntary medication under *Harper* criteria or

9  under *Sell* criteria.  And so *Harper* is, like, an immediate

10 danger to themselves or others or symptoms that are so severe

11 that the person is disabled by that.  For Ms. Wallace, that was

12 never a question.

13     So for her hearing, this -- this administrative hearing was

14 just for the purposes of preparation for *Sell*, so deciding if

15 psychiatry, based on my testimony, based on others's

16 testimonies, believed that Ms. Wallace would need medication

17 under *Sell* to become competent.

18 Q.   All right.  So just to recap that a little bit, *Harper* is a

19 standard that would allow the BOP to involuntarily medicate

20 someone if it was determined after an administrative hearing

21 that the person was either a danger to themselves or to others,

22 is that a fair summary?

23 A.   Yes.

24 Q.   Okay.  And that is not Ms. Wallace?  Nobody is

25 suggesting --

```
 1   A.   Right.
 2   Q.   -- that she is a danger to herself and that is not your
 3   opinion, is that correct?
 4   A.   Exactly.  Ms. Wallace was never in that category.
 5   Q.   Okay.  And, in fact, is Government's Exhibit 6 the BOP
 6   forms and summary of that hearing that took place on
 7   November 17th of 2021?
 8   A.   Could you ask that question again?
 9   Q.   Certainly.
10        Is Government's Exhibit 6 the BOP paperwork and summary
11   regarding that November 17, 2021, hearing?
12   A.   Yes, it is.
13   Q.   And, in fact, did you testify at that hearing?
14   A.   I did.
15   Q.   And if we look at page -- well, in the bottom right-hand
16   corner, it says page three of four.  About two-thirds of the way
17   down the page, do you see a subsection B that says, summary of
18   treatment, evaluating team member statements, with your name and
19   then a summary of your testimony?
20   A.   Yes.
21   Q.   Have you seen this document before you came here today?
22   A.   Yes, I did.
23   Q.   And is this a fair summary of your testimony from that
24   hearing?
25   A.   It is.
```

DR. AMOR CORREA - DIRECT EXAMINATION BY MR. ELDRIDGE      42

1  Q.   I want to go back to page one of Exhibit 6 for a minute.

2       Do you recognize the handwriting in the top section that

3  starts, "Ms. Cuccio?"  And that's C-U-C-C-I-O.

4  A.   Mm-hmm.

5  Q.   Whose handwriting is that?

6  A.   I recognize Ms. Wallace's handwriting.

7            MR. ELDRIDGE:  Judge, for purposes of the hearing,

8  I'd offer Government's Exhibit 6.

9            THE COURT:  Mr. LaRose?

10           MR. LAROSE:  No objection.

11           THE COURT:  All right.  Exhibit 6 then is admitted

12  for purposes of this hearing.

13  Q.   Dr. Correa, you talked a little bit about *Harper* criteria.

14      Do you agree with the conclusion that under the *Harper*

15  criteria, Ms. Wallace is not a danger to herself or others?

16  A.   I agree with that.

17  Q.   All right.  Is it further -- what is your opinion as to Ms.

18  Wallace's competency without taking antipsychotic medications?

19  A.   In the 120 days that Ms. Wallace was here for restoration,

20  we tried all non-medication forms of treatment.  And so those

21  were not successful in restoring her to competency.  I would

22  anticipate if she were to be ordered for another 120 days of

23  restoration with those same methods that the outcome would be

24  the same, this is why I am thinking medication is really the

25  only way to make sure she's restored to competency.

1  Q.  In your opinion, has the medical staff at FMC Carswell

2  exhausted the non-medicative options for restoring Ms. Wallace

3  to competency?

4  A.  Yes.

5  Q.  So is it your opinion that without taking the recommended

6  antipsychotic medications, that Ms. Wallace will remain

7  incompetent to assist in her defense and to participate in these

8  legal proceedings?

9  A.  Yes.

10  Q.  All right.  Thank you very much, Doctor.

11          MR. ELDRIDGE:  Judge, those are my questions.

12          THE COURT:  All right.  Mr. LaRose, cross exam.

13          MR. LAROSE:  Thank you, Judge.

14  CROSS EXAMINATION BY MR. LAROSE:

15  Q.  Doctor, with regards to the difference between her having

16  delusions only regarding this case and her not having delusions

17  or acting, I'll say, normally regarding the rest of her life, is

18  it unusual for a patient to present with such a limited area of

19  delusion?

20  A.  It's not unusual with someone who only meets diagnostic

21  criteria for delusional disorder.  And so outside of the

22  specific delusions, the person appears completely functional and

23  really doesn't have any ramifications.

24  Q.  Okay.  And you talked about all the nonmedical treatment,

25  and I know we've touched on the talk therapy or psychotherapy

1   regarding that.

2       What other nonmedical -- non-medicine treatment was

3   provided to her other than the talk therapy during the 120-day

4   restoration period?

5   A.   So she was also enrolled in a weekly competency restoration

6   group.  And so that's an avenue where the -- a lot of defendants

7   who are here for competency restoration meet and bounce ideas

8   off each other.  There's a facilitator who is a psychologist who

9   runs the group.  And in that forum, they focus a lot on factual

10  understanding, but also challenging of delusions.

11      And in those groups, there are people with delusions who

12  have varying degrees of insight like I talked about, and some of

13  those individuals can reflect on their delusions and how they

14  may be impacting their competency.  And so they're encouraged

15  to, you know, share some strategies and other defendants can

16  pick up basically some insight based on hearing just the stories

17  of their peers compared to an authority figure, like the

18  facilitator or the teacher or the psychologist.  And so it gets

19  the -- it gets them thinking in a different sort of way and

20  that's -- that's successful for some people.

21  Q.   Okay.  You continued to work with her throughout that

22  120-day period of attempted restoration of competency, correct?

23  A.   Yes.

24  Q.   Did you find any improvement with her from the time you

25  started meeting with her up until you wrote the January 10th

1  report?

2  A.   No.  In fact, she became more guarded and careful about

3  what she would say to me, especially in treatment team.  In

4  treatment team, she was less willing to talk about the

5  delusional thought content.  She would often look at me in those

6  meetings and say, "you know what I'm talking about," as opposed

7  to sharing what she was talking about with the rest of the

8  people.

9  Q.  You said that fairly early on, if I understand what you had

10  testified to, you felt there was going to be a need for

11  medication in her case, is that correct?

12  A.   Yes.

13  Q.  And do you know at what point you first made that

14  assessment, how long after you had been working with her?

15  A.   It was pretty close to when I was finalizing the diagnosis

16  because that's when the real rigidity of her delusional beliefs

17  became apparent.  I, as part of my initial evaluation, tested

18  her adherence and rigidity to the delusional thoughts and she

19  was extremely rigid --

20  Q.   Okay.

21  A.   -- and had no insight.

22  Q.  And when you wrote the report on, I think, January 10th of

23  the -- of what had occurred during that 120-day period, at that

24  point the 120 days was over, we're now in April, has she not

25  received any additional counseling or, you know, assistance for

1  her delusional problems since that first 120-day period expired?

2  A.   So she continues to refuse medications.  She has regular

3  check-in meetings with a psychologist, but, I mean, still, she

4  doesn't show any insight.  And when you talk to her about her

5  delusions, she behaves similarly to how she did this morning at

6  the beginning of the hearing.

7  Q.   Okay.  So she checks in with a team, but she's not

8  receiving any individual or group counseling for these delusions

9  at this time?

10 A.   She checks in with the treatment team.  She also has

11 scheduled individual meetings with a psychologist, but, again,

12 those are not very fruitful because she is so adhered to her

13 delusional thoughts.

14 Q.   And based upon what treatment has been provided to her, has

15 every other means aside from medicine been exhausted at this

16 point in time?

17 A.   Yes.

18 Q.   Okay.  Thank you.

19         MR. LAROSE:  I have no further questions.

20         THE COURT:  All right.  Any redirect?

21         MR. ELDRIDGE:  No, thank you, your Honor.

22         THE COURT:  All right.  I just have one clarification

23 question for the doctor.

24         So since the January report, she is getting some talk

25 therapy, just so I understand?

1          THE WITNESS:  Yeah, we do that with all of the

2    defendants that end up having a holdover period.  Somebody

3    checks in with her from the psychology department regularly.

4          THE COURT:  Okay.  I just want to understand what you

5    mean by checks in with her regularly.

6          THE WITNESS:  So --

7          THE COURT:  She actually has a talk therapy session,

8    like on a weekly basis, or what?

9          THE WITNESS:  So she has a talk therapy session on a

10   monthly basis and she can use that to express any kind of

11   concerns.  I don't think Ms. Wallace specifically chooses to

12   participate very much.

13         THE COURT:  Okay.  Does she have any group sessions

14   since January?

15         THE WITNESS:  She does go to social work therapy

16   groups when they happen, but, again, those are very general and

17   they wouldn't be specific towards her.

18         THE COURT:  And how often does that occur, the social

19   work?

20         THE WITNESS:  It occurs -- it occurs sporadically,

21   especially since COVID restrictions and quarantine and things

22   like that.  Sometimes it happened -- it's happened every week

23   before, but sometimes there's been a three-week break, so that

24   hasn't been consistent.

25         THE COURT:  Okay.  All right.  Thank you.

 1              All right.  Anything else for this witness, I guess,

 2    Mr. Eldridge, since I asked some questions?

 3              MR. ELDRIDGE:  No, thank you, your Honor.

 4              THE COURT:  All right.  Mr. LaRose, any other

 5    questions for this witness?

 6              MR. LAROSE:  No, thank you.

 7              THE COURT:  Okay.  All right.  Thank you, Doctor.

 8              All right.  Do you have another witness, Mr.

 9    Eldridge?

10              MR. ELDRIDGE:  I do, Judge.  May I step out for ten

11    seconds just to grab another piece of paper that I don't have in

12    front of me?

13              THE COURT:  Absolutely.

14              MR. ELDRIDGE:  Thank you very much.

15              THE COURT:  Everybody stand and stretch.

16              DR. SILVAS:  Your Honor, this is Dr. Silvas with a

17    request before I'm called to testify.  If we can also take a

18    quick break for nature so that I can focus on the questions that

19    I'm asked.

20              THE COURT:  Absolutely.  Let's -- I've got 12:27.

21    Why don't we take ten minutes?  All right?

22              DR. SILVAS:  Thank you, your Honor.

23              THE COURT:  Don't anybody disconnect from the meeting

24    because there was --

25              MR. ELDRIDGE:  I'm going to mute and stay online.

 1   Thank you, Judge.

 2            THE COURT:  Everybody mute and shut off your camera

 3   if you want to and then we'll start back up in ten minutes.

 4   Okay?  Twenty of, a little more than ten minutes.  All right?

 5   Thanks.

 6            (Court in recess.  Time noted:  12:27 p.m. to 12:39

 7   p.m.)

 8            THE COURT:  All right then.  I think we're all back

 9   and let's go back on the record.

10            All right.  We just took a brief recess and you have

11   another witness, Mr. Eldridge?  Mr. Eldridge, do you want to

12   call your next --

13            MR. ELDRIDGE:  I do.  Thank you, your Honor.

14            The government calls Dr. Jose Silvas.

15            THE COURTROOM DEPUTY:  Dr. Silvas, please raise your

16   right hand.

17            (Witness sworn.)

18            THE COURTROOM DEPUTY:  Thank you.

19            THE COURT:  All right.  You may inquire, Mr.

20   Eldridge.

21            MR. ELDRIDGE:  Thank you, Judge.

22   DIRECT EXAMINATION BY MR. ELDRIDGE:

23   Q.   Dr. Silvas, good afternoon for me, good morning for you.

24   A.   Good morning, sir.

25   Q.   Could you tell the Court where you're employed and what

1   your current job position is?

2   A.   I'm employed as a board certified staff psychiatrist at

3   Federal Medical Center Carswell in Fort Worth, Texas with the

4   Bureau of Prisons.

5   Q.   And how long have you been a psychiatrist at FMC Carswell?

6   A.   I have been a staff psychiatrist here for 14 years.

7   Q.   All right.  And aside from your BOP time, approximately how

8   long have you been a psychiatrist for?

9   A.   Forty years.

10  Q.   All right.  Dr. Silvas, do you have Government's Exhibit 4

11  in front of you?

12  A.   Yes, sir, I do.

13  Q.   What do you recognize Government's Exhibit 4 to be?

14  A.   As the curriculum vitae for myself.

15  Q.   Is this a document that you prepared?

16  A.   Yes.

17  Q.   Is it a true and accurate reflection of your CV, that is

18  your education, your prior experience as it relates to

19  psychology -- psychiatry?

20  A.   Yes.

21  Q.   Psychiatry, excuse me.

22  A.   Psychiatry, yes, sir.

23  Q.   Thank you.

24          MR. ELDRIDGE:  Judge, for purposes of the hearing, I

25  offer Exhibit 4.

```
1              THE COURT:  All right.  Any objections, Mr. LaRose?

2              MR. LAROSE:  No objections.

3              THE COURT:  All right.  Exhibit 4 then is admitted.

4   Q.  All right.  Dr. Silvas, we heard previously from Dr. Correa

5   in this proceeding about FMC Carswell.

6       Fair to say you work at the same facility?

7   A.  Yes.

8   Q.  All right.  Do the psychologists and psychiatrists work

9   together at FMC Carswell?

10  A.  We share the responsibilities for evaluating, recommending

11  treatment, and providing treatment in conjunction with the

12  services and therapies provided by each of our specialties, yes,

13  sir.

14  Q.  And as a staff psychiatrist, how is your authority

15  different than that of the psychologists like Dr. Correa?

16  A.  My primary role is to provide medically approved treatment

17  by prescribing medication for the alleviation of mental illness.

18  Q.  Is dealing with and treating mental illness a regular part

19  of your job as a staff psychiatrist at FMC Carswell?

20  A.  Yes, sir, it is.

21  Q.  Can you estimate how many people you've evaluated for

22  mental health conditions over your 14 or almost 15 years at FMC

23  Carswell?

24  A.  I couldn't really give the Court even an accurate

25  estimate -- guestimation.
```

1   Q.   Is that because it's too many to count?

2   A.   That I can agree with.

3   Q.   Okay.  Have you testified before in federal court

4   proceedings as an expert in psychiatry?

5   A.   Yes.

6   Q.   Have you testified before in federal court in *Sell*

7   hearings?

8   A.   Yes.

9   Q.   Can you estimate how many times you've done the latter,

10  that is *Sell* hearings?

11  A.   My estimate -- best recollection for *Sell* hearings in the

12  14 years is between 10 to 15 cases.

13  Q.   Okay.  Are you familiar with an individual by the name of

14  Bethann Marie Wallace?

15  A.   Yes, sir, I am.

16  Q.   And did you see Ms. Wallace on the screen here at the

17  beginning of the proceedings telling the Court that she refused

18  to participate today?

19  A.   Yes, I did.

20  Q.   All right.  And that's the person you recognized as Ms.

21  Wallace that we're going to be focused on talking about today,

22  fair statement?

23  A.   It is, yes, sir.

24  Q.   All right.  Dr. Silvas, when did you first become involved

25  in treating or caring for Ms. Wallace at Carswell?

1   A.   When she had her first meeting with the treatment team, the

2   multidisciplinary treatment team after her arrival at Carswell

3   to proceed with a competency court ordered evaluation to be

4   conducted by the psychology staff.

5   Q.   Okay.  And you were present for Dr. Correa's testimony, is

6   that fair?

7   A.   Yes, sir, I have been.

8   Q.   All right.  And that's the same evaluation that she

9   referred to earlier in her testimony starting with intake and

10  then carrying through her evaluation?  Is that the general time

11  period you're referring to?

12  A.   It is, yes, sir.

13  Q.   Can you estimate how many times you've interacted with Ms.

14  Wallace during her time at FMC Carswell?

15  A.   The specific interactions related treatment recommendations

16  relative to this case has been twice.  And then in addition to

17  that, the monthly interactions of the treatment team and any

18  interactions where I see her on the unit as I do my regular

19  rounds.

20  Q.   All right.  Have all of your interactions with Ms. Wallace

21  taken place inside FMC Carswell?

22  A.   Yes, sir, they have.

23  Q.   All right.  Is it your understanding that Ms. Wallace was

24  diagnosed with delusional disorder persecutory type at FMC

25  Carswell?

1   A.   Yes, sir.

2   Q.   Did you make that initial diagnosis of Ms. Wallace?

3   A.   No.

4   Q.   Why not?

5   A.   The manner in which forensic studies are conducted at this

6   federal medical center has the psychologist assigned to the case

7   responsible for making the diagnostic determination.

8   Q.   All right.  So in other words, that's Dr. Correa's job in

9   the first instance, fair?

10  A.   Yes, sir, it is.

11  Q.   All right.  After you received Dr. Correa's diagnosis and

12  begin evaluating Ms. Wallace, was part of the purpose of your

13  meeting with Ms. Wallace to confirm that you shared the same

14  view of Dr. Correa's diagnosis?

15  A.   For clarification, are you asking to confirm to Ms.

16  Wallace?

17  Q.   No, to confirm for yourself.

18  A.   Yes.

19  Q.   All right.  And I apologize, it was kind of a wordy

20  question.  I'll do better.

21       Did you -- after meeting with Ms. Wallace, do you agree

22  with Dr. Correa's assessment and diagnosis of Ms. Wallace as

23  having persecutory -- excuse me, delusional disorder persecutory

24  type?

25  A.   The agreement with Dr. Correa's findings includes not only

1  meeting with the said inmate, but also having reviewed Dr.

2  Correa's report findings, and also having reviewed the medical

3  record during the time that the inmate has been detained here at

4  Carswell.  So it includes all of that information.

5  Q.  And based on all of those, is it also your professional

6  medical opinion --

7              (Whereupon, the court reporter interrupted for

8  clarification.)

9              MR. ELDRIDGE:  No, no, it froze on my side, too, so I

10  apologize.  I'll ask the question again.

11  Q.  Dr. Silvas, based on all of those items, is it also your

12  professional medical opinion that Ms. Wallace has delusional

13  disorder persecutory type?

14  A.  I concur that she is diagnosed with delusional disorder

15  persecutory type, yes, sir.

16  Q.  Okay.  Was part of your interactions with Ms. Wallace for

17  the purpose of trying to restore her to competency?

18  A.  Yes.

19  Q.  As part of your interactions with Ms. Wallace, did you

20  prepare a report regarding your interactions and evaluation?

21  A.  Yes.

22  Q.  Dr. Silvas, if you could take a look at Exhibit 5, is that

23  a copy of your report dated November 16th of 2021, regarding Ms.

24  Wallace?

25  A.  Yes.

1  Q.   Is this a true and accurate copy of your November 16, 2021,

2  report?

3  A.   Yes.

4  Q.   Did you write this report yourself?

5  A.   I did, yes.

6         MR. ELDRIDGE:  Judge, for purposes of the hearing, I

7  offer Government's Exhibit 5.

8         THE COURT:  Mr. LaRose?

9         MR. LAROSE:  No objection, Judge.

10         THE COURT:  All right.  And this is an unsigned

11  exhibit.  That's the one I have, Mr. Eldridge, is that correct?

12         MR. ELDRIDGE:  That's correct, Judge.

13         THE COURT:  All right.  I'll admit it.  Exhibit 5 is

14  admitted.

15  Q.   Dr. Silvas, just for clarification, is there a copy of this

16  report that you also physically signed?

17  A.   Yes.

18  Q.   Is it any different than Government's Exhibit 5, other than

19  we don't see your handwritten signature on Exhibit 5?

20  A.   The only difference is the signature.

21  Q.   All right.  Dr. Silvas, delusional disorder persecutory

22  type, I want to talk about that for a couple minutes.

23      Is that a diagnosis that you have dealt with before?

24  A.   Yes.

25  Q.   How often?

1   A.   Because my career has been primarily in institutions and

2   treatment services for the seriously mentally ill, not

3   necessarily offenders but also private patients in treatment

4   service systems, it has been a frequent diagnosis that I have

5   encountered and dealt with.

6   Q.   Okay.  Fair to say that when you are dealing with this

7   disorder, one of your goals is to treat the condition?

8   A.   The goal is to assist the patient in understanding that in

9   my findings and opinion there is a diagnosable disorder and a

10  treatable disorder so that they know their options, to consider

11  treatment if they wish to accept it.

12  Q.   So let's talk about treatment.  How is delusional disorder

13  treated?

14  A.   Delusional disorder can be treated with psychological

15  interventions, often referred to as psychotherapy, either on an

16  individual basis or in group therapy.  And then when psychiatry

17  is involved, that's when we begin to consider the treatment of

18  the condition with the use of approved psychiatric medication.

19  Q.   Okay.  And in Ms. Wallace's case, was that first category

20  of treatment, psychotherapy, individual and group therapy, were

21  those attempted in order to restore -- in order to attempt to

22  restore Ms. Wallace to competency?

23  A.   As Dr. Correa reflected in her testimony, the psychology

24  department specifically -- specifically for forensic cases takes

25  inmates through their approved process of non-medication

DR. JOSE SILVAS - DIRECT EXAMINATION BY MR. ELDRIDGE     58

1    therapy.  So when Dr. Correa informs me, and I also learn this
2    in my participation with the treatment team, that the inmate has
3    been registered and is participating, that's how I find out that
4    that has been utilized.
5    Q.   Fair to say that your involvement or level of involvement
6    increases if the -- if the psychology department is unable to
7    treat an individual fully with non-medication means?
8    A.   I'm going to offer a clarification as follows:  There are,
9    on occasion, forensic cases referred to this institution that
10   are already prescribed medication.  So if they are taking
11   psychiatric medication already from a previous psychiatrist or
12   physician when they arrive, I immediately have the
13   responsibility to supervise and monitor, number one, whether the
14   inmate chooses to continue those medications and, if they choose
15   to continue, to monitor their response during the course of the
16   study.
17        Now, that's in contrast to other inmates that arrive that
18   have not been previously treated, as is the case with Ms.
19   Wallace.
20   Q.   That was going to be my next question.
21        Is Ms. Wallace one of those individuals who was being
22   treated with antipsychotic medications when she arrived at your
23   facility?
24   A.   No, sir.
25   Q.   Okay.  Regarding Ms. Wallace, in your professional medical

DR. JOSE SILVAS - DIRECT EXAMINATION BY MR. ELDRIDGE      59

1  opinion and based on your evaluation of her, what is necessary

2  to restore her to competence?

3  A.   With the awareness that I mentioned that she has been given

4  the opportunity to participate in non-medication restoration

5  treatment from the psychology staff and with the understanding

6  that there is now the continued consideration as to whether she

7  can achieve restoration with the alternative treatment of

8  psychiatric medication, then in reviewing where she has not

9  responded to non-medication treatment, it now is my opinion that

10  if restoration of competency is to be the goal, I don't see any

11  less restrictive alternative that's likely to achieve that

12  outcome unless medication is utilized.

13  Q.   Why is that?

14  A.   Delusional disorder, regardless of the type that is being

15  considered, understanding that there are various types of

16  delusional disorder, but regardless of the type, it is known to

17  be a very difficult psychiatric condition to treat effectively.

18  And the primary reason for that is the very cause of the

19  problem, which is that the individual does not believe that they

20  have any disorder and, therefore, doesn't have any ability to

21  understand the recommendation for treatment.

22  Q.   You said the individual doesn't have any ability to

23  understand the treatment.

24      Are you referring to what Dr. Correa and I talked about

25  during her testimony as her lack of insight?  Are those the same

1    thing?

2    A.   Yes, sir, I am.

3    Q.   Okay.  You said that it's your opinion that medication

4    would be necessary to restore Ms. Wallace to competence.  Let's

5    talk about that a little bit.

6         What is your recommended prescribed treatment of Ms.

7    Wallace?

8    A.   Specifically in her case, I have recommended a scheduled

9    antipsychotic injection that -- with the specific medication I

10   have recommended which is Invega Sustenna, the brand name, the

11   generic name is Paliperidone -- that an injection is necessary

12   because she is otherwise unwilling to consider medication on a

13   voluntary basis, which I will add I have offered to her, along

14   with the education necessary for her to understand the option,

15   and the purpose of considering voluntary consent for the same

16   medication.  The difference being, that with voluntary consent,

17   it could be prescribed orally as opposed to the current

18   involuntary recommendation for scheduled injections.

19   Q.   All right.  Let's break that down a little bit.

20        The medication you described was Invega, I-N-V-E-G-A,

21   Sustenna, S-U-S-T-E-N-N-A, which goes by the generic name

22   Paliperidone, P-A-L-I-P-E-R-I-D-O-N-E, is that right?

23   A.   Yes, sir.

24   Q.   All right.  I'm going to refer to it as Paliperidone if

25   that's okay.

1      What is Paliperidone?

2  A.   Paliperidone is in the group of antipsychotic medications,

3  most often referred to as second generation antipsychotics to

4  distinguish them from the earlier medications that were

5  utilized, which reflects upon the improvements that have been

6  made over the course of my practice in looking for medication

7  that is increasingly effective, but also at the same time can

8  avoid the onset of side effects to be a problem.

9  Q.   All right.  You mentioned -- you called it a second

10 generation antipsychotic.

11     Are you familiar with a medication called Risperidol [sic],

12 R-I-S-P-E-R-I-D-O-L?

13 A.   Yes, sir.

14 Q.   What's Risperidol?

15 A.   Risperdal is also a second generation antipsychotic that

16 came on the market preceding Paliperidone.  Paliperidone

17 actually ends up being a cousin medication because it is a known

18 metabolite that is also effective as a medication, so it became

19 developed as a separate treatment option from Risperdal

20 primarily because it was discovered that Paliperidone has a

21 lower side effect profile than Risperdal.

22 Q.   So is Risperdal a medication you considered prescribing to

23 Ms. Wallace?

24 A.   It is a medication that I will consider often in the cases

25 that I treat because through the years I had developed

DR. JOSE SILVAS - DIRECT EXAMINATION BY MR. ELDRIDGE     62

1   experience in utilizing it and determining its efficacy before

2   Paliperidone came on the market, but the answer to your question

3   is yes.

4   Q.   All right.   So is it your professional medical opinion then

5   for Ms. Wallace that Paliperidone would be more effective, as

6   well as have a less instance of side effect treatment than

7   Risperdal?

8   A.   And with your permission I'm going to add this answer for

9   full clarity.   If I provided a prescription with Risperdal

10  versus Paliperidone, both are considered capable of achieving

11  improvement in the symptoms so that Dr. Correa could potentially

12  end up determining that competency is restored.   The distinction

13  has to do primarily with the side effects because patients with

14  delusional disorder are notoriously hypervigilant and resistant

15  and hypersensitive to the outset of side effects, often to the

16  point of embellishing them.   And it is side effects that are

17  often the rate-limiting step for a doctor to be able to

18  prescribe a sufficient dose for a sufficient period of time for

19  the medication to be effective.

20      So I am choosing and recommending Paliperidone in order to

21  have the best chance to avoid side effects and avoid arising any

22  further resistance in the patient, not only Ms. Wallace, but

23  anyone diagnosed with delusional disorder, to improve the

24  chances of determining the dose that is effective for her and

25  avoiding the introduction of problematic side effects, more

1  problematic for her because of her hypervigilance secondary to

2  the disorder.

3  Q.   And what --

4  A.   I apologize for the long answer.

5  Q.   No, no, I appreciate the answer.  You're the witness, not

6  me, so thank you.

7       What is the dosage of Paliperidone that you are proposing

8  and recommending?

9  A.   The standard recommended treatment process to introduce

10 injections of Paliperidone are an initial injection of

11 234 milligrams followed one week later by an additional

12 injection of 154 milligrams.  Thereafter -- so those two initial

13 injections are known as loading doses in order to start creating

14 a concentration of the medication in the blood stream and then

15 in the brain where we want it to be effective.  Once you

16 introduce those two doses, the follow-up treatment with

17 Paliperidone is one monthly injection of 117 milligrams on a

18 monthly basis.

19      Now, I would add that there are adjustments that can be

20 made to that protocol if the particular patient being treated is

21 showing a lack of response.  There have been some patients, for

22 instance, that have received higher doses than the

23 117 milligrams a month in order to seek response because the way

24 that each individual metabolizes the medication may have an

25 effect on how effective that particular dose can be.  So I

DR. JOSE SILVAS - DIRECT EXAMINATION BY MR. ELDRIDGE      64

1   outlined for you the standard recommended protocol for

2   Paliperidone by injection.

3   Q.   And is that the -- that standard recommended treatment, is

4   that the treatment that you are recommending and believe is

5   appropriate for Ms. Wallace based on your evaluation of her and

6   your professional medical opinion?

7   A.   Yes, sir, it is.

8   Q.   If we talk -- you talked about Risperdal before.

9        Just for comparison's sake, does that have to be injected

10  less or more frequently than Paliperidone?

11  A.   That's another significant consideration in that the

12  standard recommended treatment process with long-acting injected

13  Risperdal is every two weeks, which is another barrier towards

14  anyone that is hypervigilant towards treatment.

15  Q.   All right.  So just so I understand, with Risperdal, the

16  regular dosage would be every two weeks.  With Paliperidone,

17  it's every month after the loading doses.  Have I summarized

18  that right?

19  A.   You have, yes, sir.

20  Q.   Thank you.

21       If Ms. Wallace agreed to take these medications herself,

22  could it be done orally?

23  A.   Yes, sir.

24  Q.   Has she been encouraged by the FMC Carswell medical staff,

25  including by yourself, to take these medications, that is

1    Paliperidone, voluntarily?

2    A.   Not only have -- has she been educated, it's often very

3    confusing and overwhelming for a patient going through a

4    forensic evaluation to appreciate the differences between a

5    psychologist's and psychiatrist's role in this process.  So I

6    can testify that I have been very detailed and very careful in

7    presenting not only to this inmate, which is our focus of

8    attention, but to all the treatment inmates that come before me,

9    to help them understand my role, to help them understand to the

10   capacity that they have the reason that I'm recommending

11   medication, the diagnosis, the purpose of the medication to

12   alleviate symptoms in their case for restoration, only to the

13   degree that they will then be able to understand court

14   proceedings and participate with their attorney in their

15   defense, which is to say not necessarily for any kind of cure

16   and not necessarily for the resolution of symptoms completely.

17       So often times, in providing them with the details and

18   helping them be educated as to what their choices are for

19   voluntary consent, that has proven effective in other cases in

20   inmates choosing to consent voluntarily even in the context of

21   the legal proceeding and the restoration process.  So I want the

22   Court to know that Ms. Wallace has been afforded all of that

23   information for her to consider and utilize any capacity she has

24   for voluntary consent of medical treatment.

25   Q.   Have you -- and I take it she has declined to voluntarily

1  take the prescribed medication, is that correct?

2  A.  She has declined on more than one occasion, yes, sir.

3  Q.  You say on more than one occasion.

4     In the lead up to this hearing, within the last week or so,

5  did you, in fact, go to Ms. Wallace again to try to again

6  convince her that she should voluntarily take these medications?

7  A.  I wouldn't say to convince her, but to confirm that she

8  understood the opportunity to consider voluntary treatment.  The

9  answer is, yes, I did.

10 Q.  And what was her response?

11 A.  It's important to clarify for the Court's consideration

12 that I found her to be less defensive and less hypervigilant

13 when I met with her and presented her options the first time,

14 whereas the more recent contact with her I could tell the

15 difference, as is common with delusional disorder patients, that

16 she had integrated me into her beliefs of being persecuted.  As

17 a result -- and the way that I could tell is because she refused

18 to remain for the entire examination and was so upset at my

19 trying to engage her in a treatment discussion that she said,

20 "I'm not going to talk to you anymore," got up from the chair,

21 and bolted from the nurse's station where I was conducting the

22 examination.

23 Q.  Okay.  Dr. Silvas, in order for antipsychotic medication

24 such as Paliperidone to work, is it necessary that the

25 delusional disorder disappear completely?

DR. JOSE SILVAS - DIRECT EXAMINATION BY MR. ELDRIDGE      67

1    A.   That's the reason why I made reference to the specific

2    indication and outcome that we're interested in for restoration

3    because that's different than, perhaps, the indications and

4    outcomes in other cases.  So we're talking about how the

5    delusional disorder symptoms interfere with that particular

6    patient's capacity to make life decisions.

7    Q.   Dr. Silvas, we talked a little bit before during Dr.

8    Correa's testimony about a *Harper* hearing, that administrative

9    hearing in November of 2021 regarding Ms. Wallace.

10        Were you also present for that hearing?

11   A.   Yes, I was.

12   Q.   And did you also testify at that hearing?

13   A.   I did.

14   Q.   Did you also see a copy of Government's Exhibit 6 before

15   you came in here today that on page three has a section that

16   summarizes your testimony from that hearing?

17   A.   Yes, sir, I have it before me.

18   Q.   All right.  And, in fact, is that section at the top of

19   page three on Government's Exhibit 6 an accurate summary of your

20   testimony from that hearing?

21   A.   Yes, it is.

22   Q.   And furthermore, is that testimony consistent with and

23   somewhat duplicative of what is contained in your report,

24   Government Exhibit 5?

25   A.   It is.

 1   Q.   Okay.  Is it fair to say that the result of this hearing

 2   was that the hearing psychiatrist concurred with both your

 3   assessment and Dr. Correa's assessment that Ms. Wallace would

 4   not present a danger to herself or others under *Harper,* but that

 5   if she were to be medicated, the Court would have to go through

 6   a *Sell* hearing and analysis?

 7   A.   Yes, sir.

 8   Q.   All right.  And is that just another way of saying the only

 9   appropriate way to medicate her would be for purposes of

10   restoring competency under the *Sell* factors?

11   A.   Yes, sir.

12   Q.   All right.  Dr. Silvas, in your professional medical

13   opinion, is there a substantial likelihood that the

14   antipsychotic medication you've recommended for Ms. Wallace,

15   that is the Paliperidone in the doses you've described, will be

16   successful in restoring Ms. Wallace to competency so that she

17   could proceed in these proceedings?

18   A.   Yes.

19   Q.   What does substantial probability mean to you?  Can you

20   define or quantify that so the Court can better understand?

21   A.   The first thing that I will say, as I had said earlier in

22   my testimony, is that delusional disorder is known to be a very

23   difficult-to-treat psychiatric condition.  And the reason that

24   it's difficult to treat is because of how the patient integrates

25   their false beliefs in conjunction with their particular

DR. JOSE SILVAS - DIRECT EXAMINATION BY MR. ELDRIDGE     69

1   personality style and their life experience.  And since

2   personality is a lifelong pattern of how a person lives their

3   life and makes their decisions, I always make it a point to

4   bring it to the Court's attention how personality can interfere

5   with it because it's a constant lifelong characteristic and

6   combined with the particular false beliefs -- because the

7   medication is not going to have any impact on the personality.

8   So we're talking about the biochemistry in the brain associated

9   with the thinking process leading to the delusional beliefs that

10  responds to the medication treatment, and that's the component

11  that underscores my recommendation that she is likely to

12  respond.

13      All right.  So if delusional treatment [sic] is difficult

14  to treat -- if you look at the psychiatric literature, you will

15  find very few studies that have looked at treatment response for

16  delusional disorder because you can't get patients to want to

17  participate in the studies voluntarily.  Therefore, number one,

18  at Federal Medical Center Butner, a study was conducted some

19  years ago that was able to get participation by inmates

20  diagnosed with delusional disorder to determine response rate.

21  That study is often referred to because there's so few studies.

22  And in that study, the response rate was at 70 percent.  And so

23  70 percent is commonly the response rate that's referred to when

24  you have an involuntarily individual receiving treatment.

25  Q.  And do you concur with the findings of that Butner report

1  as to the substantial likelihood that prescribing this

2  medication to Ms. Wallace is substantially likely to restore her

3  to competency?

4  A.   To give a complete answer, over the scope of my career --

5  when I trained as a psychiatrist, my professors warned me and

6  cautioned me that at that time there was no treatment effective

7  for delusional disorder.  Through the intervening years of the

8  science of medication making improvements, there are now

9  medications that are effective, including Paliperidone, in

10  treating delusional disorder.

11      The one thing that I also wanted to mention is, okay, if

12  you have a limited number of cases for delusional disorder to

13  show efficacy, is that all you have?  As Dr. Correa had

14  mentioned in the scope of psychotic disorders, schizophrenics

15  also experience delusions.  And it is available through studies

16  to show that the delusions suffered by people diagnosed with

17  schizophrenia do respond, so that's the other major area that

18  shows the efficacy of antipsychotic medication to alleviate the

19  intrusive characteristics of delusions.

20  Q.   All right.  So I just want to make sure that I understand.

21  It is your professional medical opinion that there's a

22  substantial likelihood that by Ms. Wallace taking the prescribed

23  and recommended doses of Paliperidone, that it's substantially

24  likely that she would be restored to competency, fair statement?

25  A.   Yes.

1  Q.  And that opinion is based not only on your training and

2  experience, but your interactions personally with Ms. Wallace,

3  is that also fair?

4  A.  Yes, sir.

5  Q.  Would Ms. Wallace's taking Paliperidone impair her ability

6  to assist in her own defense of this case?

7  A.  The reason that I recommend Paliperidone, as I've already

8  stated, is our best opportunity to avoid side effects.  But that

9  doesn't guarantee being able to avoid all side effects.  It is a

10 standard of care to anticipate some degree of side effects being

11 reported or observed in any particular patient.  But the side

12 effects that I'm referring to, such as the onset of a mild

13 tremor, for instance as one example, are not likely to be so

14 severe or persist as to interfere with the competency that is

15 restored.

16 Q.  So you mentioned side effects.  Let's talk about side

17 effects.

18     What is your opinion on whether Paliperidone might have

19 negative side effects by someone who uses it?

20 A.  It is likely that any patient that I prescribe Paliperidone

21 will report side effects.  It is even more likely if the patient

22 is diagnosed with delusional disorder that they will report side

23 effects.  So that piece of clinical work has to do with, number

24 one, determining the validity of the report, and then

25 determining whether there is a clinical association with the

1  medication being the cause, and then thirdly, making a

2  determination as to whether there's any additional treatment

3  that is necessary to alleviate the side effects.

4      I will restate that as follows:  It is common when

5  antipsychotics are prescribed to also find indication to

6  prescribe anti-side effect medication.  Another reason for

7  recommending Paliperidone to the Court is because as difficult

8  as it is to get an individual to accept so-to-speak involuntary

9  treatment, I don't want to also face the additional complication

10  of needing to prescribe side effect medication unless I have no

11  choice.

12  Q.  Can you predict the likelihood of side effects occurring in

13  Ms. Wallace from Paliperidone or the severity of any side

14  effects?

15  A.  The prognosis for the patient with delusional disorder

16  reporting side effects is 100 percent.

17  Q.  Explain.

18  A.  I don't think -- I don't think that that can be avoided,

19  but the likelihood of any reported side effects being severe is

20  very low.  To be more specific, likely less than ten percent.

21  Q.  All right.  So let's talk a little bit about that.  You --

22  I apologize for the fire trucks going by outside.

23      You mentioned before that Paliperidone is what you

24  considered a second generation antipsychotic.  Is one of the

25  features of the second generation antipsychotics that they have

1  better tolerability and less side effects than their

2  predecessors, the first generation antipsychotics?

3  A.   Very definitely.  And that is the primary reason why the

4  treatment of psychotic disorders has become so much easier for

5  so many more patients to accept, even on a voluntary basis.

6  Q.   And if someone at FMC Carswell, and specifically Ms.

7  Wallace, is being given Paliperidone, will she be continually

8  monitored to see if there are any side effects?

9  A.   Yes, since she is housed on an inpatient mental health

10  unit, it's important to note that the supervision by mental

11  health nurses and correctional staff is 24 hours a day, seven

12  days a week.

13  Q.   If side effects were to be shown in Ms. Wallace, is FMC

14  Carswell equipped to manage them?

15  A.   Yes.

16  Q.   What are some of the more -- you mentioned minor side

17  effects such as tremors.

18       What are some of the more serious side effects that are

19  possible -- possible by someone who's given Paliperidone?

20  A.   The most serious side effects that are possible and need to

21  be considered as possibilities with any antipsychotic

22  medication, one is known as neuroleptic malignant syndrome, NMS,

23  which is basically an allergy reaction to the medication that

24  would result in an elevation in the individual's body

25  temperature, instability in the individual's blood pressure, and

1   physical symptoms of very severe muscular rigidity, so severe

2   that the rigidity is physically uncomfortable.  And it is

3   considered an emergent medical condition that requires emergent

4   care.  So it's important to note that, but also important to

5   note that the risk of neuroleptic malignant syndrome is very

6   rare with the second generation antipsychotics.

7       The other primary concern of serious side effects is known

8   as tardive, T-A-R-D-I-V-E, dyskinesia, D-Y-S-K-I-N-E-S-I-A,

9   which is a reaction to long-term treatment with antipsychotics

10  where the body, the brain, and nervous system begin to lose the

11  capacity for voluntary motor movement.  That was a particular

12  concern with patients that were treated over many years in state

13  hospitals with the first generation antipsychotics and has not

14  been a problem of anything but rare concern.  I've never had it

15  occur to any of my patients in the course of the prescriptions

16  that I have written.

17  Q.  All right.  So on the tardive dyskinesia condition, if I

18  understand you right, in 40 years of prescribing antipsychotic

19  medications, you've never seen it occur in your patients, is

20  that correct?

21  A.  Not correct.  I've never seen it occur with the second

22  generation antipsychotics.  I did have to treat it in the first

23  generation treatment with patients.

24  Q.  Thank you.

25      And is that an important factor to you in recommending this

1   medication, Paliperidone, as a second generation antipsychotic

2   in terms of your professional opinion in weighing the benefits

3   versus the risks in recommending this medication for Ms.

4   Wallace?

5   A.   It is.  And I would add, so that the Court is aware, my

6   tolerance for introducing side effects in my patients with

7   prescriptions that I write is very high, primarily because

8   before I worked in the corrections area, I was trained and

9   practiced as a child psychiatrist.  And that experience makes a

10  treating psychiatrist exquisitely sensitive to introducing side

11  effects to children and adolescents, and I carry that in my

12  clinical assessment into my current work with adults.

13  Q.   Let me just make sure I understand that correct, Dr.

14  Silvas.

15       So you said your tolerance for side effects is very high?

16  A.   I'm sorry, it is low for introducing them --

17  Q.   Okay.

18  A.   -- so -- meaning I want to do everything I can to avoid

19  them.

20  Q.   All right.  Your sensitivity towards them is very high,

21  your tolerance for them is very low, is that fair?

22  A.   Thank you for the clarification.  That is correct.

23  Q.   All right.  I understand.

24       In terms of the second generation antipsychotic

25  medications, does the time -- the amount of time that the

1    individual such as Ms. Wallace would be taking that medication

2    as it relates to the risk of a serious side effect like tardive

3    dyskinesia, is that relevant at all in your analysis?

4    A.   It is because the history with tardive dyskinesia and its

5    onset is, as I said, most commonly related to those individuals

6    that are still treated at times with first generation

7    antipsychotics, and the knowledge that the onset of tardive

8    dyskinesia is to be expected only if an individual really has

9    received constant ongoing treatment over at least one year

10   period of time.  That had been the usual pattern of onset if it

11   emerged at all.

12   Q.   And in general, and based on your training and experience,

13   how long do you think it would take for you to see some type of

14   a reaction or a positive change in Ms. Wallace from taking this

15   mediation?  Or maybe a better way for me to ask that question

16   is:  Based on your training and experience, how long does it

17   take for Paliperidone to be effective in a person who's taking

18   it?

19   A.   My standard recommendation in previous testimonies of this

20   sort to the Court was to anticipate a timeframe of response of

21   three to six months.  The additional research that I have come

22   across with Paliperidone is indicating that Paliperidone has an

23   efficacy that can be found in patients as quickly as one week

24   after the initial injection, which was stunning for me to find

25   out.  I've never seen that kind of response with any other

1   antipsychotic medication.

2   Q.   In any event, whether a week or three to six months, is

3   that far less than the approximately one year or so period of

4   time that it would generally take for someone to show tardive

5   dyskinesia even in the unlikely event that they develop that as

6   a side effect?

7   A.   Yes.  And the reason that I have made the recommendation as

8   long as six months has primarily to do with the treatment

9   process of dealing with side effects, having to make dose

10  adjustments, potentially having to change to another medication,

11  so that allows me the time to do all of the necessary treatment

12  adjustments for the purpose of restoration.

13  Q.   Dr. Silvas, in some cases more generally --

14          THE COURT:  Mr. Eldridge, you froze again.

15          MR. ELDRIDGE:  Oops.  Yep, I just got a message.

16          THE COURT:  We can hear you now.  So you're going to

17  have to start that question all over again.

18          MR. ELDRIDGE:  No problem.  I can't see everybody,

19  but that's okay with me.  As long as you guys can hear and see

20  me, I'll keep going.

21          THE COURT:  We can.

22  Q.   So, Dr. Silvas, in some cases more generally, do the risks

23  of taking medications sometimes outweigh the benefits to the

24  patients?

25  A.   Yes.

DR. JOSE SILVAS - DIRECT EXAMINATION BY MR. ELDRIDGE      78

1  Q.   And have you come to that conclusion in other cases and

2  therefore decided against recommending medications?

3  A.   Yes.

4  Q.   What about in this case, is it your opinion that the risks

5  of taking Paliperidone for Ms. Wallace outweigh the potential

6  benefits in restoring her to competency?

7  A.   By virtue of review of the medical record, I did not

8  identify any contraindications to recommending treatment that

9  would be an unacceptable risk.

10  Q.   So is the -- in your medical opinion, is the treatment

11  you're recommending, that is taking Paliperidone, necessary and

12  appropriate to restore Ms. Wallace to competency?

13  A.   Yes.

14  Q.   Is there a less intrusive treatment that would be practical

15  or workable based on your training, your experience, your

16  dealing with Ms. Wallace, and in reviewing her records that

17  would be practical or workable to restore Ms. Wallace to

18  competency?

19  A.   Well, there is a treatment option that is workable because

20  it's considered a standard of care in the psychological toolbox,

21  but in terms of restoration of competency in a delusional

22  patient not practical.

23  Q.   And what is that treatment?

24  A.   Cognitive behavioral therapy is considered an effective

25  standard of care in the psychologic realm for psychotic

1  disorders and delusional disorders if the involved patient is

2  willing to engage and participate in the treatment, which is not

3  the case here.

4  Q.   Okay.  So it's your opinion that that treatment is not

5  workable for Ms. Wallace, is that fair?

6  A.   Well, it can be offered and I don't -- I'm not sure -- Dr.

7  Correa would have to say whether any aspect of cognitive

8  intervention of that side -- that sort has been tried, I don't

9  know, but I can certainly say that the practical aspect of that

10  treatment when a patient is resistant to even considering having

11  a disorder is -- makes it out of the question.

12  Q.   Okay.  And your view is Ms. Wallace is resistant to such

13  thoughts or -- I think it was described before that she lacks

14  insight into her condition, is that fair?

15  A.   She lacks insight and she is very rigid and resistant to

16  rational recommendations.

17  Q.   Is the treatment that you're recommending, that is the

18  Paliperidone in the doses that you've discussed today, medically

19  appropriate for Ms. Wallace?

20  A.   They are a standard of care and are medically appropriate,

21  yes, sir.

22  Q.   Is it your testimony that there would be little to no

23  chance of restoring Ms. Wallace to competency in a reasonable

24  amount of time without her taking antipsychotic medication?

25  A.   Yes.

1  Q.  And is it your testimony that there is a substantial

2  likelihood, I think you said over 70 percent in the Butner

3  study, of restoring her to competency with the regimen of

4  Paliperidone that you're recommending?

5  A.  Yes.

6  Q.  Given your training and experience, would you be

7  recommending this medication for Ms. Wallace if you didn't

8  believe it had a substantial likelihood of restoring her to

9  competency?

10 A.  No, because I'm not going to expose a patient under my care

11 to unnecessary side effects if there's no benefit to be gained.

12 Q.  And, Dr. Silvas, given your training and experience, would

13 you be recommending this medication to the Court for Ms. Wallace

14 if you believed that the risks in her taking it were greater

15 than the benefits of her taking it to restore her to competency?

16 A.  No.

17 Q.  Thank you.

18           MR. ELDRIDGE:  Judge, those are my questions.

19           THE COURT:  All right.  Thank you, Mr. Eldridge.

20           Mr. LaRose?

21           MR. LAROSE:  Thank you.

22 CROSS EXAMINATION BY MR. LAROSE:

23 Q.  Dr. Silvas, you said at one point, I think earlier on in

24 the treatment process, that you explained and tried to provide

25 education to Ms. Wallace in order to obtain her voluntary

1  consent as to what the medication was and what it would do, is

2  that right?

3  A.  Yes, sir.

4  Q.  And did you feel that when you were talking to her she

5  understood your explanation and understood what you were

6  proposing to her?

7  A.  Yes, sir.  As was reenforced by the patient to me that she

8  understood by her response the reason she didn't need the

9  treatment that I was recommended -- recommending is because she

10  did not believe that she had any form of mental illness.

11  Q.  And when she was advised, I think it was, approximately a

12  week ago once again of the request for her to take the

13  medication and you said that she presented in a more defensive

14  posture towards yourself at this point in time, has she been

15  made aware that without her consent she may be forced to take

16  the medication?

17  A.  Yes, sir.  I have received an example of her outrage when I

18  began to discuss that outcome with her if she did not wish to

19  consider voluntary treatment, yes.

20  Q.  And in what manner did she express her opposition to you?

21  A.  She yelled, "I am not going to talk to you anymore," and

22  bolted from the room.

23  Q.  Okay.  You talked about the necessity to do this by

24  injection based upon her reluctance to take it.  I guess my

25  question is just if this medication is able to be administered

1   orally, how often does the patient have to take it as opposed to

2   the monthly injection?

3   A.   For the same medication, Paliperidone, to be effective for

4   the purpose of restoration of competency, the individual would

5   need to accept oral medication on a daily basis.

6   Q.   Okay.  And you said that I think it can be three to

7   six months for the medication generally to work, but there may

8   be results from this medication within as soon as a week after

9   it has begun to be administered, is that correct?

10  A.   I found a study that provided that information, yes, sir.

11  That is correct.

12  Q.   So let me ask you this:  If she remains at Carswell and you

13  begin providing her with this medication by injection, at what

14  point or at what intervals is she going to be reassessed to

15  determine whether it's effective and she has reached a level of

16  competency that would be noticed to court?

17  A.   That is a two component answer as follows:  The standard of

18  care for follow-up with me where I will be monitoring for the

19  noted side effects is every two to four weeks.  I am not able to

20  state how often Dr. Correa will meet once medication, if

21  approved, is initiated.  And the reason that's important is

22  because it is the psychologist who will make the determination

23  if there is a notable response of restoration and not the

24  treating psychiatrist.

25  Q.   Okay.  So I guess that was my question then.  So that'll --

1    that determination is bifurcated, you just follow through with

2    the administration of the medicine and what the side effects are

3    and how that is working out, and then the psychologist continues

4    to make the competency determinations?

5    A.   With the additional information that I do have the

6    responsibility to keep the psychologist informed and apprized if

7    I encounter any side effects or any barriers to treatment.

8    Because the standard of care that we have agreed upon in the

9    past, the courts would allow me to proceed with making changes

10   in the medication without informing the court if it was

11   medically appropriate and necessary to proceed, and that's no

12   longer the case.  Now, the courts require very specific

13   treatment plans, as has been presented in this case, and if

14   there is a problem where I clinically determine that proceeding

15   with treatment with Paliperidone is no longer recommended, I

16   need to inform Dr. Correa so she can inform the court, and then

17   determination and guidance be received on how to proceed.

18   Q.   If the determination is made that the medication is

19   suitable for her and is improving her situation, would she --

20   would it be necessary for her to remain on it indefinitely?

21   A.   That's a very pertinent question as follows:  I also make

22   sure that I inform a patient who may be recommended for

23   involuntary antipsychotic medication by injection that the

24   course of treatment is only to sustain competency during the

25   court process.  Once that is completed, it is common for the

 1  individual to have the option to choose whether they want to

 2  continue the treatment or not.

 3      That would introduce as follows:  The possibility that if

 4  they were sentenced, they would begin their sentence, if they've

 5  chosen to discontinue the medication, without involuntary

 6  treatment.  That, of course, introduces the risk of relapse.

 7  And then if the inmate who's sentenced at that time deteriorates

 8  to the point that psychiatric treatment involuntarily is again

 9  indicated, we have to go through an entire separate process to

10  introduce involuntary medication if consent has not been

11  obtained.

12  Q.  Is there a general timeframe in which a determination is

13  made whether this medication is effective or whether it should

14  be discontinued?

15  A.  No, sir, there's not a general timeframe.  That is based on

16  the individual response of the patient.

17  Q.  Okay.  And just back to the dosage for a moment.

18      If it's found to be effective, would it continue to be

19  administered on a one-month basis through the court process

20  then, through any trial or sentencing?

21  A.  Yes.

22  Q.  Okay.  If the patient is taken off of the medication either

23  because it's determined to not be effective or it reaches a

24  point where they're allowed to voluntarily terminate the

25  medication, are there any withdrawal symptoms that the patient

1   would experience?

2   A.   Withdrawal symptoms are unlikely, understanding that the

3   timeframe for the body to clear the medication and metabolize it

4   is five to seven days, but not likely to be associated with this

5   medication to have side effects.

6   Q.   Okay.   Thank you.

7            MR. LAROSE:   I have nothing further.

8            THE COURT:   All right.   Mr. Eldridge, anything else

9   for this witness?

10           MR. ELDRIDGE:   No, thank you, your Honor.

11           THE COURT:   All right.   Do you have any other

12  witnesses then, Mr. Eldridge?

13           MR. ELDRIDGE:   No, your Honor.

14           THE COURT:   All right.   Mr. LaRose, are you going to

15  call anybody?

16           MR. LAROSE:   I am not, Judge.

17           THE COURT:   All right.   Then I think we are done

18  with -- well, I guess I'll ask you both if you want to make a

19  brief closing statement, but I'm also going to direct that you

20  submit briefs on proposed findings of fact and conclusions of

21  law.   So if you'd like to make a short closing statement now,

22  I'll permit that, Mr. Eldridge.

23           MR. ELDRIDGE:   No, thank you, Judge.   I'll be happy

24  to order the transcript of the proceedings and provide a written

25  submission as the Court's requested.

PROCEEDINGS                                      86

1          THE COURT:  All right.  Mr. LaRose?

2          MR. LAROSE:  I will waive an oral statement and

3     reserve for the written response.

4          THE COURT:  Okay.  All right.  So let's go off the

5     record for a moment.

6          (Whereupon, a discussion was held off the record.

7     Time noted:  1:48 p.m. to 1:50 p.m.)

8          THE COURT:  Let's go back on the record.

9          All right.  So counsel is going to -- counsel for the

10    government is going to request a copy of the transcript and the

11    court reporter has indicated she could probably get that done by

12    the end of the week, but we'll give her a little breathing room.

13    If you get it done by Monday, Ms. Cavanaugh, that would very

14    helpful.

15         All right.  And then I'll direct that closing briefs

16    be filed by April 29th.

17         MR. ELDRIDGE:  Yes, your Honor.

18         THE COURT:  All right.  If something, you know,

19    changes in your schedule, your trial goes longer Mr. LaRose, or

20    something else, if you need more time, put a letter on the

21    docket before April 29th and let me know --

22         MR. LAROSE:  Okay.

23         THE COURT:  -- and I'll make a further directive.

24         But I'm looking for proposed findings of fact and

25    conclusions of law in your closing briefs.  Okay?

PROCEEDINGS                    87

1              MR. ELDRIDGE:  Understood, your Honor.

2              MR. LAROSE:  Yes, your Honor.

3              THE COURT:  All right.  I think that wraps it up

4   right now.  So I'm going to obviously reserve decision until I

5   see your closing briefs and we'll go from there.

6              In the meantime, Ms. Wallace is to stay where she is,

7   you can keep monitoring that she's getting there.  All right?

8              All right.  Anybody -- anything either counsel wants

9   to state on the record at this time?  Have I covered everything

10  or did I miss anything, let me put it that way.

11             Mr. Eldridge?

12             MR. ELDRIDGE:  Nothing from the government, Judge.

13  Thank you.

14             THE COURT:  All right.  Mr. LaRose, anything else on

15  behalf of the defendant?

16             MR. LAROSE:  No, nothing further.  Thank you.

17             THE COURT:  All right then.  I think we are concluded

18  then.  Thank you to both doctors there for your testimony today.

19             MR. ELDRIDGE:  Yes, thank you.

20             DR. SILVAS:  You're welcome, your Honor.

21             MR. ELDRIDGE:  Thank you, Dr. Silvas.  Thank you, Dr.

22  Correa.  And thank you, your Honor.

23             THE COURT:  All right, everybody.  Have a good day

24  and stay well.

25             (Time noted:  1:52 p.m.)

```
1

2

3

4                  CERTIFICATE OF OFFICIAL REPORTER

5

6

7      I, HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR, NYRCR,

8  Official U.S. Court Reporter, in and for the United States

9  District Court for the Northern District of New York, DO HEREBY

10 CERTIFY that I transcribed the foregoing proceedings from a

11 digital recording, and that the foregoing is a true and correct

12 transcript thereof.

13

14            Dated this 9th day of April, 2022.

15

16            s/ Hannah F. Cavanaugh_____

17            HANNAH F. CAVANAUGH, RPR, CRR, CSR, NYACR, NYRCR

18            Official U.S. Court Reporter

19

20

21

22

23

24

25
```