UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

|  |  |
|---|---|
| v. | 5:21-CR-124 |
|  | (MAD/TWD) |

BETHANN MARIE WALLACE,

                              Defendant.
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| FOR THE Government: | |
| TRINI E. ROSS, ESQ. | SEAN C. ELDRIDGE, ESQ. |
| United States Attorney, | Assistant U.S. Attorney |
| Western District of New York | |
| United States Attorney's Office | |
| 100 State Street, Suite 500 | |
| Rochester, NY 14614 | |
| | |
| FOR THE Defendant: | |
| OFFICE OF STUART J. LaROSE | STUART J. LaROSE, ESQ. |
| 247 West Fayette Street, Suite 315 | |
| Syracuse, NY 13202 | |

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION</u>

On April 8, 2021, Bethann Marie Wallace ("Defendant") was indicted for threatening

United States Representative John Katko by interstate communication.  (Dkt. No. 26.)  Defense

counsel moved for a competency determination, and the undersigned found Wallace mentally

incompetent to stand trial.  (Dkt. Nos. 29 (sealed), 34.)  Efforts to restore Wallace's competency

were unsuccessful, and she refused to voluntarily take antipsychotic medications.  (Dkt. No. 36

(sealed).)  The United States of America (the "Government") moved to forcibly medicate

Wallace under *Sell v. United States*, 539 U.S. 166, 179 (2003), and the undersigned held a video

hearing on April 6, 2022.  (Dkt. Nos. 38, 43.)  The Court has also reviewed and considered the

parties' post-hearing submissions.  (Dkt. Nos. 47, 50.)  For the following reasons, the

undersigned recommends that the District Court GRANT the Government's motion.

I.    **BACKGROUND**

    A.    **Procedural History**

On September 16, 2020, the Government filed a Criminal Complaint alleging that on July

10, 2020, Wallace called the Washington, D.C. office of United States Representative John

Katko and left a voice message wherein she threatened to shoot him in the head, kill him, and

rape him.  (Dkt. No. 1.)  Wallace was subsequently indicted on April 8, 2021, for Threatening a

United States Official under 18 U.S.C. §§ 115(a)(1)(B) and 115(b)(4) (count one) and Threats by

Interstate Commerce under 18 U.S.C. § 875(c) (count two).  (Dkt. No. 26.)

After an initial appearance on September 7, 2020, a detention hearing was held on

September 21, 2020, and Wallace was released on conditions.  (Dkt. No. 7.)  Upon learning that

Wallace had a pending DWI charge in New York State, the Court held a hearing on October 15,

2020, to discuss possible additional conditions of release.  (Dkt. No. 20.)  Wallace subsequently

violated the conditions of release, and the Court ordered her arrest.  (Dkt. Nos. 14, 17 (sealed).)

Following a hearing on January 12, 2021, the Court ordered Wallace's detention pending trial.

(Dkt. No. 20.)  In so ordering, the Court noted Wallace "failed to tell her counsel and the Pretrial

Services Officer who prepared the Pretrial Services report" that she had a pending DWI charge,

she "refused to attend recommended treatment; she willfully and abruptly disconnected from the

telephone conference hearing which was scheduled to address her refusal to attend treatment;

and she threatened all participants of that proceeding."  *Id.* at 3.

Defense counsel[1] requested a hearing to determine Wallace's competency, and the Court held a competency hearing on May 4, 2021.  (Dkt. Nos. 30, 31.)  Following the hearing, the Court ordered a psychological examination of Wallace under 18 U.S.C. § 4241(b).  (Dkt. No. 31.)  Wallace was subsequently transported to the Carswell Federal Medical Center ("Carswell"), a Federal Bureau of Prisons facility located in Fort Worth, Texas, for the required examination. (Dkt. No. 34 at 2.)

At Carswell, forensic psychologist Amor Correa, Ph.D., tested and examined Wallace. *Id.*  Dr. Correa issued a report on July 16, 2021 (the "July report"), wherein she concluded Wallace suffered from a mental disease or defect that compromised her ability to rationally understand the proceedings against her, to assist her counsel adequately and consistently in her own defense, and to make decisions regarding her legal strategy.  *Id.* at 2-3.  Dr. Correa therefore opined Wallace was not competent to stand trial and should remain at Carswell where she would be monitored and encouraged to take antipsychotic medication to restore her competency.  *Id.* at 3.  At the ensuing competency hearing on August 31, 2021, the parties did not challenge Dr. Correa's competency conclusion and Wallace assented to further treatment to restore her competency.  *Id.*  This Court accordingly found Wallace not competent to stand trial and directed that she be committed to a mental health facility for further treatment for restoration of competency. *Id.* at 3-4.

Dr. Correa completed another report on January 7, 2022 (the "January report").  (*See* Dkt. No. 36 (sealed).)  In that report, Dr. Correa concluded Wallace continued to be incompetent to stand trial.  *Id.* at 1, 7.)  According to Dr. Correa, Wallace "participated fully in all available

---

[1] Defendant was initially represented by an attorney in the Syracuse Office of the Federal Public Defender.  (*See* Dkt. No. 5.)  Following a withdrawal request from that office, the Court appointed CJA counsel to represent Defendant on January 12, 2021.  (*See* Dkt. No. 18.)

treatment alternatives that do not involve medication," but her condition did not improve. *Id.* at 7. Dr. Correa opined the use of the proper antipsychotic medication would likely restore Wallace's competency. *See id.* However, Wallace refused to voluntarily take such medication. *See id.*

On January 31, 2022, the Government moved, pursuant to *Sell*, for a hearing to forcibly medicate Wallace to restore her competency for trial. (Dkt. No. 38.) Defense counsel opposed the Government's request to forcibly medicate Wallace but agreed that a *Sell* hearing should occur. (Dkt. No. 39.) The Court accordingly held a *Sell* hearing via video on April 6, 2022. (Dkt. No. 43; *see also* Text Minute Entry 4/6/2022.)

### B.    The *Sell* Hearing

At the outset of the hearing, Wallace was present, along with her counsel, and counsel for the Government. (Dkt. No. 43 at 2.) The undersigned explained the purpose of the *Sell* hearing, and Wallace indicated she understood. *Id.* at 3-4. Wallace then stated, "I'm refusing because there's no actual charges and you know it and I know it, and I don't appreciate psychiatry and psychology trying to tell me that I'm delusional because there's no actual charges because he's not a congressman, so it doesn't matter if I called his phone." *Id.* at 4. The undersigned explained that Wallace was facing real charges and the Court was ready to go forward with the *Sell* hearing. *Id.* at 4-5. The undersigned further explained that Wallace had been given notice of the hearing and was entitled to attend the hearing with counsel, testify if she wished to, confront the Government's witnesses, and have her counsel cross examine those witnesses and present evidence on her behalf. *Id.* at 4. Wallace asked what would happen if she refused to attend the hearing, and the undersigned explained Wallace had a right to attend but would be waiving that right if she left the hearing. *Id.* at 4-5. Wallace said, "[w]ell, I'm waiving my right

to be here." *Id.* The Court urged Wallace to stay and asked her if she understood that she would be waiving her right to attend the hearing if she left. *Id.* Wallace confirmed that she understood and left the hearing. *Id.*

The hearing proceeded, and the Government called two witnesses: Dr. Correa and Jose R. Silvas, M.D. *Id.* at 9-85. Dr. Correa, a forensic psychologist employed at Carswell, testified first. *Id.* at 10. She explained the diagnosis and opinions in her July and January reports were informed by documents she reviewed, consultations with other mental health professionals, behavioral observations of Wallace, and psychological tests. *Id.* at 17-20, 22, 27, 45. Dr. Correa diagnosed Wallace with delusional disorder, persecutory type, and explained the disorder caused Wallace to have rigid delusional beliefs about her case, the undersigned, the attorneys, the government, the FBI, the U.S. Marshals, and Representative Katko. *Id.* at 20, 24-29; *see generally* Dkt. No. 33 (sealed) at 4-8; Dkt. No. 36 (sealed) at 4-6. Dr. Correa testified that when she discussed the case with Wallace, "her responses to the questions stopped being accurate and reality-based" and "she exhibited several delusional thoughts . . . about her specific court situation and all of the people involved in her legal case." (Dkt. No. 43 at 20; *see also id.* at 24-29, 35-36, 38 (discussing delusionary disorder, persecutory type).)

Dr. Correa reported "[i]n the 120 days that Ms. Wallace was here for restoration, we tried all non-medication forms of treatment," and they "were not successful in restoring [Wallace] to competency." *Id.* at 42. Wallace's treatment included one-on-one talk therapy with a psychologist, group therapy sessions, and a referral to a psychiatrist, Dr. Silvas. *Id.* at 32, 34, 44, 46-47. Dr. Correa opined that if Wallace "were to be ordered for another 120 days of restoration with those same methods . . . the outcome would be the same." *Id.* at 42. According to Dr. Correa, "medication is really the only way to make sure [Wallace is] restored to competency."

*Id.* at 42.  However, Wallace refused to voluntarily take the medications Dr. Silvas recommended.  *See id.* at 36, 38, 46, 66.

Following Dr. Correa's testimony, the Government called Dr. Silvas, a staff psychiatrist at Carswell.  *Id.* at 49-50.  Dr. Silvas explained his evaluation of Wallace was based on meeting with her, reviewing her medical records, and reviewing Dr. Correa's reports.  *Id.* at 54-55.  He agreed with Dr. Correa's diagnosis—that Wallace has delusional disorder, persecutory type.  *Id.* at 55; *see also id.* at 56-58 (discussing delusional disorder, persecutory type).  Dr. Silvas stated delusional disorders are difficult to treat with talk therapy because an individual with such a disorder "does not believe that they have any disorder and, therefore, doesn't have any ability to understand the recommendation for treatment."  *Id.* at 59.  Based on his evaluation of Wallace, Dr. Silvas concluded there was no "less restrictive alternative that's likely to achieve [restoration of her competency] unless medication is utilized."  *Id.*; *see also id.* at 78-79.  Stated differently, Dr. Silvas concluded it was unlikely Wallace could be restored to competency without taking antipsychotic medication.  *Id.* at 79.

Dr. Silvas accordingly recommended using the drug Invega Sustena, also known as Paliperidone, to restore Wallace's competency for trial.  *Id.* at 60.  He recommended administering a standard treatment protocol, beginning with "an initial injection of 234 milligrams followed one week later by an additional injection of 154 milligrams," followed by monthly injections of 117 milligrams.  *Id.* at 63-64.  Dr. Silvas explained that Paliperidone was preferred over Risperdal, an alternative antipsychotic medication, because it required fewer injections.  *Id.* at 64.  He testified that Paliperidone offered the "best opportunity to avoid side effects," and would cause only mild side effects.  *Id.* at 71.  He explained that although Wallace was certain to report some side effects, "the likelihood of any reported side effects being severe

6

is very low." *Id.* at 72. Dr. Silvas stated the severe side effects associated with Paliperidone

(i.e., neuroleptic malignant syndrome and tardive dyskinesia) were rare and occurred in

individuals who had "received constant ongoing treatment over at least one year." *Id.* at 73-76.

Dr. Silvas accordingly recommended Paliperidone treatment for "three to six months." *Id.* at 76;

*see also id.* at 77 (explaining this timeframe would allow him to deal with any side effects, make

dose adjustments, and "do all of the necessary treatment adjustments").

Dr. Silvas opined there was a substantial likelihood that administering Paliperidone

according to this standard treatment protocol would restore Wallace to competency. *Id.* at 68.

He explained there were "very few studies" showing the efficacy of Paliperidone, but pointed to

a study conducted at the Butner Federal Medical Center (the "Butner study") on individuals

diagnosed with delusional disorder. *Id.* at 69. According to Dr. Silvas, "in that study, the

response rate was 70 percent." *Id.* Based on the Butner study, similar studies on individuals

with schizophrenia, his training, his experience, and his evaluation of Wallace, Dr. Silvas opined

there was a substantial likelihood the use of Paliperidone would restore Wallace to competency.

*Id.* at 69-71; *see also id.* at 80. Dr. Silvas accordingly concluded the use of Paliperidone was

necessary and appropriate to restore Wallace to competency. *Id.* at 78.

Finally, Drs. Correa and Silvas testified that they attended a Federal Bureau of Prisons

administrative hearing conducted to determine whether Wallace should be involuntarily

administered psychiatric medication. *Id.* at 39-42, 67-68. They both testified at that hearing,

which took place on November 17, 2021. *Id.* at 41, 67. Along with Drs. Correa and Silvas, the

hearing psychiatrist concluded Wallace was not a danger to herself or others. *See id.* at 42, 68.

Defense counsel called no witnesses and presented no evidence. *See id.* at 9-85.

7

## II.    DISCUSSION

### A.    Legal Standard

The Fifth Amendment prohibits the government from depriving an individual of "life, liberty, or property, without due process of law."  U.S. Const. amend. V.  All persons possess a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs. *Washington v. Harper*, 494 U.S. 210, 221-22 (1990); *see also Sell*, 539 U.S. at 178-79.[2]  This right extends to criminal defendants deemed mentally incompetent for trial.  *Sell*, 539 U.S. at 178-80; *see also United States v. Decoteau*, 857 F. Supp. 2d 295, 301 (E.D.N.Y. 2012).  "Yet, mental incompetence prevents criminal defendants from being tried."  *Decoteau*, 857 F. Supp. 2d at 301; *see also Drope v. Missouri*, 420 U.S. 162, 171 (1975); 18 U.S.C. § 4241.  "At the same time . . . the government has a significant interest in pursuing justice and in bringing accused defendants to trial."  *Decoteau*, 857 F. Supp. 2d at 301 (citing *Sell*, 539 U.S. at 179); *see also United States v. Magassouba*, 544 F.3d 387, 402-403 (2d Cir. 2008).

The Supreme Court balanced these competing interests in *Sell*, concluding the government may involuntarily medicate a mentally ill defendant to render her competent for trial if it can demonstrate that four conditions are met.  *Sell*, 539 U.S. at 179-81; *United States v. Gomes*, 387 F.3d 157, 159 (2d Cir. 2004).  The government must demonstrate that each condition is met by clear and convincing evidence.  *Gomes*, 387 F.3d at 160; *see also United States v. Ruiz-Gaxiola*, 623 F.3d 684, 692 (9th Cir. 2010) ("[E]very circuit to address the issue has concluded that the government must bear the burden of proving the relevant facts by clear and convincing evidence.") (collecting cases).

---

[2] Unless otherwise indicated, in quoting cases, all alterations, internal quotation marks, emphases, footnotes, and citations are omitted.  *See, e.g.*, *Sczepanski v. Saul*, 946 F.3d 152, 157 n.4 (2d Cir. 2020).

"First, a court must find that important governmental interests are at stake." *Sell*, 539 U.S. at 180. "In assessing the seriousness of a defendant's alleged crimes, courts have looked to factors such as the applicable statutory minimum and maximum sentences, and the likely United States Sentencing Guidelines range." *United States v. Campbell*, No. 13-CR-419 (DLI), 2015 WL 9460133, at *3 (E.D.N.Y. Dec. 23, 2015) (collecting cases); *see, e.g.*, *Gomes*, 387 F.3d at 160-61. Courts also "consider whether the potential for civil commitment abates the Government's interest in prosecuting [the defendant]." *Gomes*, 387 F.3d at 161; *see generally Sell*, 539 U.S. at 180 (instructing courts to "consider the facts of the individual case in evaluating the Government's interest in prosecution," and discussing the potential for civil confinement).

"Second, the court must conclude that involuntary medication will significantly further those concomitant state interests." *Sell*, 539 U.S. at 181. This is a two-part inquiry that requires the court to consider whether the proposed treatment (i.e., administration of antipsychotic drugs) is (1) "substantially likely to render the defendant competent to stand trial," and (2) "substantially unlikely to have side effects that will interfere significantly with the defendant's ability to assist counsel in conducting a trial defense, thereby rendering the trial unfair." *Id.*; *see also Gomes*, 387 F.3d at 161.

"Third, the court must conclude that involuntary medication is necessary to further those interests." *Sell*, 539 U.S. at 181. "The court must find that any alternative, less intrusive treatments are unlikely to achieve substantially the same results." *Id.*; *see also Gomes*, 387 F.3d at 162. The court must also "consider less intrusive means for administering the drugs, *e.g.,* a court order to the defendant backed by the contempt power, before considering more intrusive methods." *Sell*, 539 U.S. at 181; *see, e.g.*, *United States v. Sergentakis*, 216 F. Supp. 3d 343, 350 (S.D.N.Y. 2016) (requiring "the first step in any treatment plan be an attempt to enlist the

Defendant's cooperation by engaging in a discussion of the available options of [voluntarily] taking oral antipsychotic medications").

Fourth, "the court must conclude that administration of the drugs is medically appropriate, *i.e.,* in the patient's best medical interest in light of h[er] medical condition." *Sell*, 539 U.S. at 181.  This involves evaluating the specific drug or drugs at issue, along with known side effects and efficacy.  *Id.*; *see also id.* at 185 ("Whether a particular drug will tend to sedate a defendant, interfere with communication with counsel, prevent rapid reaction to trial developments, or diminish the ability to express emotions are matters important in determining the permissibility of medication to restore competence"); *see, e.g.*, *Decoteau*, 857 F. Supp. 2d at 306 ("The evidence taken as a whole demonstrates that the risks and severity of the potential side effects are not sufficient to render the proposed treatment medically inappropriate.").

### B.    Analysis

As a threshold matter, the undersigned concludes rendering Wallace competent to stand trial is the only purpose for which forced medication is warranted.  *See Sell* 539 U.S. at 181-82; *Campbell*, 2015 WL 9460133, at *3; *accord* Dkt. No. 47 at 9.  Drs. Correa and Silvas testified that Wallace did not pose a threat to herself or others.  (*See* Dkt. No. 43 at 42, 68.)  Accordingly, rendering Wallace competent to stand trial is the only ground for which she may be forcibly medicated at this juncture.  *See Sergentakis*, 216 F. Supp. 3d at 347 n.3; *Campbell*, 2015 WL 9460133, at *3; *Decoteau*, 857 F. Supp. 2d at 302 n.1.

The undersigned also notes Wallace waived her right to attend the hearing, testify, and confront the Government's witnesses by leaving the *Sell* hearing.  *See generally* 18 U.S.C. 4247(d).  Criminal defendants are granted certain procedural rights during *Sell* hearings.  *See id.* Among those are the right to "be represented by counsel" and "be afforded an opportunity to

testify, to present evidence, to subpoena witnesses . . . and to confront and cross-examine witnesses who appear at the hearing." *Id.* Here, Wallace was represented by counsel at the *Sell* hearing. (*See* Dkt. No. 43 at 3.) However, at the outset of the hearing, Wallace stated that she refused to participate. *Id.* at 4. The undersigned explained that Wallace had the right to attend the hearing, be represented by counsel, testify, confront the Government's witnesses, and have counsel present evidence and cross examine the Government's witnesses. *Id.* Wallace asked what would happen if she refused to attend, and the undersigned informed her, "[t]he hearing will go forward." *Id.* at 5. The undersigned further explained Wallace would be waiving her right to attend by leaving. *Id.* Wallace responded, "[w]ell, I'm waiving my right to be here." *Id.* The undersigned confirmed with Wallace a second time that she understood she would be waiving her right to attend by leaving, and Wallace left the hearing. *Id.* By leaving the hearing, Wallace waived her right to attend, testify, and confront the Government's witnesses. (*See* Dkt. No. 47 at 2; *cf. United States v. White*, 620 F.3d 401, 414 n.11, 422 (4th Cir. 2010) (noting the defendant "refused to attend or to participate in the *Sell* hearing," and denying the government's *Sell* motion on other grounds); *United States v. Ferguson*, No. 04-14041-CR, 2018 WL 2316726, at *3, 6 (S.D. Fla. May 22, 2018) (granting the government's *Sell* motion and noting that the defendant "had to be removed from the video conference" and "did not testify" at the *Sell* hearing); *United States v. Timmins*, No. CR 99-49-BR, 2005 WL 1231456, at *2, 5 (D. Or. May 23, 2005) (granting the government's *Sell* motion and noting defendant "refused to attend or even monitor the proceedings by telephone").)

The Court now considers each of the *Sell* factors, in turn.

### 1.    Important Government Interests are at Stake

"Threatening the life of federally protected individual is, by definition, a serious offense." *United States v. Feretti*, No. CIVA1:08-51 (GLS) (DRH), 2009 WL 4730227, at *3 (N.D.N.Y. Dec. 2, 2009).  Here, Wallace is charged with one count of threating to kill United States Representative John Katko in violation of 18 U.S.C. § 115(a)(1)(B) and § 115(b)(4).  (*See* Dkt. No. 26.)  If convicted on that count, Wallace would face a maximum punishment of ten years in prison.  *See* 18 U.S.C. § 115(b)(4).  Wallace is also charged with one count of threatening to injure Representative Katko via interstate communications in violation of 18 U.S.C. § 875(c).  (*See* Dkt. No. 26.)  If convicted on that count, Wallace would face a maximum punishment of five years in prison.  *See* 18 U.S.C. § 875(c).

The punishment Wallace faces for count one alone—ten years—is serious and is likely to eclipse her term of pretrial detention.  *See United States v. Evans*, 404 F.3d 227, 238 (4th Cir. 2005) (explaining "a felony whose maximum term of imprisonment is 10 years—is serious under any reasonable standard"); *United States v. Chrestman*, 525 F. Supp. 3d 14, 28 (D.D.C. 2021) (describing a violation of 18 U.S.C. § 115(a)(1)(B) as a "serious felony offense[]").  The Government has a strong interest holding individuals accountable for threatening to kill duly elected members of the United States House of Representatives.  *See United States v. Steward*, 343 F. App'x 252, 254 (9th Cir. 2009) (concluding "the Government has an important interest in" prosecuting violations of 18 U.S.C. § 115(b), which "are serious" crimes); *United States v. Palmer*, 507 F.3d 300, 303 (5th Cir. 2007) (concluding "important governmental interests [we]re at stake" in prosecuting a violation of 18 U.S.C. § 115(a)(1)(B), which is a "serious" crime); *accord* 18 U.S.C. § 115(b)(4) ("A threat made in violation of this section shall be punished by a fine under this title or imprisonment for a term of not more than 10 years, or both").  Such conduct impacts government operations by heightening alarm and chilling a congressperson's

representation of his constituents. By holding Wallace accountable for this conduct, "the government is seeking to protect the very integrity of our system of government." *United States v. Gillenwater*, 749 F.3d 1094, 1101 (9th Cir. 2014) (O'Connor, J., Ret.). The Government accordingly has a strong interest in punishing and deterring such conduct. *See id.*; *Steward*, 343 F. App'x at 254; *Palmer*, 507 F.3d at 303.

Moreover, civil commitment seems an unlikely option for Wallace, as both Drs. Correa and Silvas testified she is not a danger to herself or others at Carswell. (Dkt. No. 43 at 42, 68; *see also Gomes*, 387 F.3d at 161 (finding it unlikely the defendant would be civilly committed where, among other reasons, she was "not a danger in the prison setting")). Dr. Correa further indicated that Wallace's delusions—the reason she has been deemed incompetent for trial— relate specifically to the facts of this case and do not suggest Wallace is a danger to herself or others. (Dkt. No. 43 at 20, 23-26, 42; *see also Gomes*, 387 F.3d at 161 (finding it unlikely the defendant would be civilly committed where, among other reasons, "the disorders diagnosed in this case relate specifically to the competency determination and not to the risk of Gomes harming other persons or property")).

The undersigned accordingly concludes the Government carried its burden of demonstrating by clear and convincing evidence that important government interests are at stake. *Gomes*, 387 F.3d at 160.

## 2. Involuntary Medication will Significantly Further Government Interests

The use of Paliperidone will significantly further the Government's important interests. *Sell*, 539 U.S. at 181. First, the undersigned finds the Government carried its burden of demonstrating by clear and convincing evidence that Dr. Silvas's proposed Paliperidone treatment protocol is substantially likely to render Wallace competent to stand trial. *See id.*;

13

*Gomes*, 387 F.3d at 161.  The undersigned finds the testimony of Dr. Silvas, a psychiatrist with over forty years of experience, credible.  (*See* Dkt. No. 43 at 49-85.)  Dr. Silvas testified that in his experience, Paliperidone has been effective at restoring individuals with delusional disorders to competency.  *Id.* at 50, 70.  He further opined that, based on his experience, training, and interactions with Wallace, the use of Paliperidone was substantially likely to restore Wallace's competency.  *Id.* at 70-71.

Dr. Silvas referenced some studies on the efficacy of Paliperidone (i.e., the Butner study and the use of Paliperidone on individuals with schizophrenia), but also cautioned there were "very few studies that have looked at the treatment response for delusional disorder because you can't get patients to want to participate in the studies voluntarily."  *Id.* at 69-70.  The Government did not introduce those studies as evidence at the *Sell* hearing or attach them to post-hearing briefing, so the undersigned has not had the opportunity to consider them.  *See generally id.*; *see also* Dkt. No. 50.  In any event, several courts have rejected the Butner study. *See generally United States v. Watson*, 793 F.3d 416, 426 (4th Cir. 2015) ("The one study cited by the government that does unequivocally support the involuntary use of antipsychotic medication to restore the competency of defendants with the Persecutory Type of Delusional Disorder is, by its own terms, vulnerable to bias in favor of finding a positive response to treatment due to its experimental design."); *Ruiz-Gaxiola*, 623 F.3d at 698 (noting that "[b]y their own terms, the findings of the [Butner] study are both limited and tentative."); *Feretti*, 2009 WL 4730227, at *5 (noting that government experts have relied on the Butner study "with mixed results") (collecting cases).  For these reasons, the undersigned assigns no persuasive value to the Butner study.  Rather, based on the credible testimony of Dr. Silvas, the undersigned finds the Government carried its burden of demonstrating that the proposed Paliperidone treatment

protocol is substantially likely to render Wallace competent to stand trial. *See Decoteau*, 857 F. Supp. 2d at 305 (concluding the government carried its burden of demonstrating the proposed treatment was substantially likely to render the defendant competent with testimony from an experienced psychiatrist).

Second, the Government also carried its burden of demonstrating the proposed Paliperidone treatment will not produce side effects that interfere with Wallace's ability to assist trial counsel. *Sell*, 539 U.S. at 181. Dr. Silvas explained Paliperidone "is in the group of antipsychotic medications, most often referred to as second generation antipsychotics" because they are more effective and cause fewer side effects than "the earlier medications that were utilized." (Dkt. No. 43 at 61; *see also id.* at 71-73.) Dr. Silvas explained Paliperidone was unlikely to cause severe side effects (i.e., "less than ten percent"), but it would cause some mild side effects that were unlikely to interfere with Wallace's competency. *Id.* at 71-72. He further explained Carswell was equipped to manage side effects and would closely monitor Wallace throughout her Paliperidone treatment. *Id.* at 73. The undersigned finds this testimony credible. The Government accordingly carried its burden of demonstrating by clear and convincing evidence that the proposed Paliperidone treatment will not produce side effects that interfere with Wallace's ability to assist trial counsel. *Sell*, 539 U.S. at 181.

### 3. Involuntary Medication is Necessary to Further Government Interests

Involuntary medication is necessary to further the Government's interests because alternative, less intrusive treatments are unlikely to render Wallace competent for trial. *Sell*, 539 U.S. at 181. The Government carried its burden of demonstrating this with testimony from Drs. Correa and Silva. Moreover, Wallace's own conduct indicates that less intrusive measures will not suffice.

First, Drs. Correa and Silva offered testimony indicating less intrusive treatments were unlikely to render Wallace competent for trial. (Dkt. No. 43 at 42, 78; *accord* Dkt. No. 74 at 9.) Dr. Correa testified that she and her team at Carswell "tried all non-medication forms of treatment," but they "were not successful in restoring [Wallace] to competency." (Dkt. No. 43 at 42.) Dr. Correa further testified "another 120 days of restoration with those same methods" would not restore Wallace's competency. *Id.* She accordingly opined "medication is really the only way to" do so. *Id.* Similarly, Dr. Silvas testified delusional disorders are difficult to treat with talk therapy because an individual with such a disorder "does not believe that they have any disorder and, therefore, doesn't have any ability to understand the recommendation for treatment." *Id.* at 59. Based on his evaluation of Wallace, Dr. Silvas concluded talk therapy was "out of the question" and would not restore Wallace to competency. *Id.* at 79. This evidence indicates less intrusive treatments are unlikely restore Wallace to competency. *Sell*, 539 U.S. at 181.

Second, both Drs. Correa and Silvas testified that Wallace repeatedly refused to consider voluntarily taking antipsychotic medication. *Id.* at 36, 38, 46, 66, 81. When Dr. Correa counseled Wallace to voluntarily take the antipsychotic medication, Wallace said "she didn't need it, that she didn't have any mental illness, and that it was unnecessary." *Id.* at 38. Similarly, when Dr. Silvas educated Wallace about the antipsychotic medication, she "refused to remain for the entire examination . . . got up from the chair, and bolted from the nurses station." *Id.* at 66. This evidence suggests attempting to enlist Wallace's cooperation by discussing the voluntary administration of antipsychotic medication is unlikely to work. *See generally Sergentakis*, 216 F. Supp. 3d at 350 (requiring "the first step in any treatment plan be an attempt

to enlist the Defendant's cooperation by engaging in a discussion of the available options of taking oral antipsychotic medications on a daily basis at the lowest effective dose.").

Finally, a contempt order is unlikely to compel Wallace to participate in her rehabilitation, and fundamentally misunderstands the nature of her condition. Wallace rigidly adheres to her delusional beliefs (i.e., this is not a real court, there are no real charges, and Representative Katko is not a real congressman), and there is no indication—therapeutic or otherwise—that the threat of a contempt order from this Court would clear her of her delusions or pierce the rigid shield of those delusions. (*See* Dkt. No. 43 at 4, 24-25, 34-38, 45, 79; *see, e.g.*, *United States v. Baschmann*, No. 10-CR-300-A, 2015 WL 346719, at *14 (W.D.N.Y. Jan. 23, 2015) (concluding a court order to the defendant, backed by the contempt power . . . would be ineffective").). More to the point, despite urging from the undersigned, Wallace refused to participate in the *Sell* hearing. (*See* Dkt. No. 43 at 4-5; *see, e.g.*, *Timmins*, 2005 WL 1231456, at *5 ("Timmins's refusal to attend the evidentiary hearing or to listen to the proceedings by telephone despite urging by the Court and Dr. Mrad demonstrates that even a Court order backed by the contempt power of the Court requiring Timmins to take antipsychotic medication would not be effective."). The threat of a contempt order is accordingly unlikely to compel Wallace to participate in her rehabilitation.

Based on the foregoing, the undersigned finds the Government has carried its burden of demonstrating by clear and convincing evidence there are not any alternative, less intrusive treatments likely to render Wallace competent for trial. *Sell*, 539 U.S. at 181.

### 4.    The Administration of Paliperidone is Medically Appropriate

The administration of Paliperidone is medically appropriate because, given Wallace's condition, it is in her best interest. *Sell*, 539 U.S. at 181. The Government carried its burden of establishing this by clear and convincing evidence with testimony from Drs. Correa and Silvas.

17

For example, Dr. Silvas opined Paliperidone was the appropriate medication to treat Wallace's delusional disorder, and his proposed treatment protocol was the current "standard of care." (Dkt. No. 43 at 79.)  He explained Paliperidone causes mild side effects and was unlikely to cause severe side effects.  *See id.* at 61, 71-73; *see also Baschmann*, 2015 WL 346719, at \*15 (concluding treatment was medically appropriate where "the likelihood of side effects was lower, and . . . any side effects would be treatable."); *Decoteau*, 857 F. Supp. 2d at 306 ("The evidence taken as a whole demonstrates that the risks and severity of the potential side effects are not sufficient to render the proposed treatment medically inappropriate.").  Similarly, Dr. Correa opined antipsychotic medication was the only way to restore Wallace's competency for trial. (Dkt. No. 43 at 42.)

Moreover, Paliperidone is an appropriate medical intervention because Wallace's delusional disorder may have played a part in the alleged criminal conduct at issue. *See Sergentakis*, 216 F. Supp. 3d at 355 (concluding "the potential that Defendant's conduct is a manifestation of his mental illness weighs in favor of ordering medication to treat the illness"). Among other delusions, Wallace appears to believe Representative Katko is "not a congressman," there are "no actual charges," and her threatening call never reached Representative Katko's office because "sound waves that interfere with communication" blocked her call.  *See id.* at 4; Dkt. No. 1 at 4.  "[A] certifiedly delusional defendant advancing a possibly delusional defense is not an option in our system."  *Gomes*, 387 F.3d at 162.  In circumstances like these—where all other interventions have failed and the defendant continues to harbor delusions about her case—administering "standard of care" treatment with a low risk of side effects is medically appropriate.  *Accord Decoteau*, 857 F. Supp. 2d at 306.

**C.    CONCLUSION**

For the foregoing reasons, the Court finds the Government has demonstrated by clear and convincing evidence that all *Sell* conditions are met.  Therefore, the undersigned recommends that: (1) the District Court order, pursuant to 18 U.S.C. § 4241(d)(2)(A), that Wallace shall remain in the custody of the Attorney General at Carswell for further treatment to restore her to competence to proceed to trial; (2) Wallace may be involuntarily medicated to restore her competence if she does not voluntarily accept medication, all in accordance with Dr. Silvas's proposed Paliperidone treatment plan; (3) the staff at Carswell may perform involuntary physical and laboratory assessments and monitoring that are clinically indicated, if Wallace does not voluntarily submit to such assessments and monitoring; (4) the ordered period of treatment shall be four months from its commencement, which may be extended upon court approval; (5) the Government shall file monthly progress reports with the Court during the treatment period, with the fourth report being filed at least two weeks before the end of the four-month period concurrently with any request to extend the period; (6) if there is a change in relevant circumstances, including changes in Wallace's medical condition, Defendant or the Government may move at any time to amend this order; (7) if Wallace is restored to competence, a report shall be filed with the Court discussing the results of the treatment, whether and how the medications will affect Wallace at trial, and how to monitor for effects of the treatment throughout trial; and (8) if it is determined that the treatment has failed, the Government shall file a report so advising the Court and assessing Wallace's current mental and physical condition.

Accordingly, it is therefore

**RECOMMENDED** that the Government's motion for an order authorizing involuntary medication of Wallace to restore her competency (Dkt. No. 38) be **GRANTED** in accordance with the above-outlined procedures.

19

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.

Dated: May 31, 2022
   Syracuse, New York

           Therese Wiley Dancks
           United States Magistrate Judge